### 3.   Court-Ordered and Violent Students

46.   Perhaps most clear and harmful of all in terms of the flat-out inconsistency with its often-touted mission as a "therapeutic" school, HLA has throughout the Class Period erroneously claimed that it does not accept "court-ordered," "violent" or "severely-disturbed" students.   In fact, Hidden Lake has accepted at least five court-ordered children in the past five years, and routinely accepts violent and severely disturbed students.

47.   The truth about Hidden Lake's admission practices began to be admitted in a February 24, 2006 email obtained by Plaintiffs which Clarke Poole, who was HLA's Admissions Director during the period January 2000 through March 15, 2006, sent to Nicole Fuglsang, HLA's current Admissions Director (and, subsequently, to other persons).   In that email, Poole outlined three examples of students whose violent pasts should have precluded them from ever attending Hidden Lake.   One of the students, a female with a violent personal history, sexually assaulted another female student, causing "internal injuries in the pelvic area."   "Then, rather than being dismissed immediately, she remained enrolled [at Hidden Lake] for another month [before leaving]."

48.   The other two students, both of whom were male, were referred to HLA by Buccellato.   In fact, Buccellato has throughout the Class Period also maintained a "side" business as an educational consultant, although he has almost always referred to

28

HLA each of the families with whom he consults.  Buccellato's role as a so-called independent educational consultant and the personal economic incentives he had to refer children to HLA contributed to populating HLA during the Class Period with children who did not meet HLA's stated criteria.  In fact, former HLA Admissions Director Poole labeled one of these male students as "dangerous" with the psychological profile of "Hannibal Lecter", and questioned how Hidden Lake could have ever accepted the other student in the first place.  Poole continued that "there are others, of course, who were known from the beginning to be inappropriate for placement, and I'll be glad to go into them with you, but I'm sure you are starting to get the point."  According to Poole's February 24, 2006 email:

> From:  Clarke Poole
> Sent:  Friday, February 24, 2006 9:50 AM
> To:  Nicole Fuglsang
> Subject:  FW:  HLA Student Profile.....
>
> Nicole,
>
> * * *
>
> There is a fairly long list of students whose appropriateness I have questioned, especially in the last year or so.  To point to just a few, let's look at (Jane Doe 1), (John Doe 1), and (John Doe 2).
>
> (Jane Doe 1) had trouble here from the beginning, with most of her incidents involving violence.  Finally, she was complicit in an elopement that culminated in the physical, and, by all indications, sexual assault on another student who was hospitalized for several days due to her physical injuries, especially internal injuries in the pelvic area.  Then,

29

rather than being dismissed immediately, she remained enrolled here for another month. The educational consultant who referred her to Hidden Lake was (Consultant 1).

(John Doe 1) came here with a very troubling history and equally troubling psychological evaluation. He was constantly involved in trouble including physical assaults on other students. He finally attacked and threatened to kill another student and the on-call clinical staff was called to evaluate him. She determined he was not only sincere but determined to actually try to kill the other student, and signed the order to have him committed to a psychiatric hospital. He did not return to Hidden Lake. The educational consultant who referred him to Hidden Lake was its owner, Len Buccellato.

Finally, we have (John Doe 2). Why in the name of Heaven this boy was ever even considered for admission to Hidden Lake is beyond me. He should have been in a padded cell in a psychiatric prison, and we knew it going in. It's difficult to distinguish his psychological evaluation, which was done by Len Buccellato and [intentionally deleted], from that of Hannibal Lecter's. Yet, in spite of first hand knowledge that this boy was not only totally inappropriate but dangerous, he was approved for admission and attended for a full year, interspersed with hospitalizations, until withdrawn by his parents. The educational consultant who referred him to Hidden Lake was (Consultant 2).

As an aside to this disgraceful episode with (John Doe 2), I took a call several months ago from (Consultant 3) an educational consultant in Miami. She had received from us a copy of [intentionally deleted], in which was a photo of (John Doe 2). A month before (John Doe 2)'s family contacted (Consultant 2) for help in finding placement, they had called on (Consultant 3) at her office. She had, quite sensibly, recommended only RTC's for (John Doe 2), but there was his picture in [intentionally deleted], a Hidden Lake student. In her excited (foreign) accent, she said "Clarke! My God, Clarke! This boy is a student there? Oh

30

my God!"  At least I was able to tell her he was no longer enrolled, but I was unable to give her a reason as to why he had ever been accepted in the first place without opening an ethical can of worms, so I feigned ignorance.

There are others, of course, who were known from the beginning to be inappropriate for placement, and I'll be glad to go into them with you, but I'm sure you are starting to get the point.  Len has repeatedly said to me and everyone else who has ever worked in this department that "we do not do well with dysthymic kids", yet I have never seen a dysthymic kid not accepted for admission.  If we know we do poorly with them, why accept them?  At least they are not a danger to others, but they do little for our retention rate, which currently stands at 40% for Peer Groups graduating in May (assuming none of the few who remain are withdrawn between now and then).

This brings us back to your question about my being or not being a part of the team.  Just for clarification, you stated "You chose", indicating I have already made my decision, and the implication was that I had chosen to not be a part of the team.  Perhaps you meant to say "choose", but perhaps not.  I have, in fact, chosen, but not in the sense that you imply.  As I said in an e-mail to you and Len several months ago, every comment and observation I have made as an HLA employee has been made with the intention of calling to management's attention practices that I believe are detrimental to the reputation and longevity of Hidden Lake Academy, as well as the safety and therapeutic well being of its students.  Also as I pointed out, every time I do so I am reprimanded.   I have a long list of such occurrences archived which I'll be glad to share with you and with others, should that be necessary.  I am trying to be a member of this team, but I am not an automaton or a sheep. I have views and opinions which I am qualified by education and experience to express.  No one has to like them or act on them, and obviously no one ever has; but I still feel compelled to state them, even if it puts my job in

jeopardy, especially if I believe they involve ethical compromises and issues of student safety.

I'll be glad to meet with you and with Len to discuss these and all other issues that are of concern to you; and when we do so, I will go into a longer list of concerns of my own. I would appreciate a response to the issues I have raised here in my response to your question regarding my commitment to this school, and my competence in evaluating applicants.

Sincerely,
Clarke Poole[.]

49.     As he acknowledges, Poole's email omits numerous other examples of violent and mentally disturbed children who during the Class Period have attended, and some who still currently attend, Hidden Lake.  In the past year alone, one female student reportedly attempted to commit suicide by hanging herself in her dorm room, and suffered serious brain damage, while during a recent two month period four other students also reportedly attempted suicide.

50.     The admission of violent and severely disturbed children during the Class Period has led to other students being repeatedly and violently assaulted, including at least one knife stabbing and vicious gang-like beatings.  In January of this year, one student left Hidden Lake within weeks of his entering the school after he was violently assaulted on three separate occasions, the last of which reportedly resulted in an investigation by the Lumpkin County Sheriff's Department.

51.     In an effort to ameliorate at least some aspects of the violent and anti-social behavior of many of its students, the school has made it a standard practice to

32

strip-search students as a safety measure.  However, HLA's practice of strip-searching its students is not disclosed adequately in its Handbook or other documentation given to parents.  Although students and parents often complain to Hidden Lake about this practice, arguing that the school should have mentioned it in its Handbook, Hidden Lake reportedly continues to strip search at least some of its students on a routine basis.

52.    Hidden Lake's reluctance to reject court-ordered, severely disturbed and violent students stems from the fact that it is highly profitable to admit such students. With monthly tuition currently totaling over $5,900, parents can spend well-over $123,900 to send their children to Hidden Lake for the 21 month term.  Indeed, as pointed out in Poole's email, it was Buccellato himself who referred two of Hidden Lake's most violent students in the past few years.

53.    The presence of several court-ordered, severely disturbed and violent students is both contrary to HLA's representations to families and undermines HLA's mission to provide a therapeutic environment for its students, much less a "safe" and "healthy" environment as HLA represents.  Parents, meanwhile, are misled both into enrolling their children at HLA initially on the belief that it is a nurturing and "therapeutic" place, and also thereafter in keeping their children enrolled as their childrens' communications with their families are monitored closely by HLA officials throughout their HLA enrollment so that they do not disclose to their parents their actual HLA experiences.  Even when the children visit their families off-campus during vacations, among other things, HLA students are dissuaded from disclosing the truth under threat of being placed on restrictions when they return to campus.

54.    In addition to misrepresenting itself to prospective students and their parents including with respect to the types of children it enrolls, Hidden Lake has been successful in recruiting students to the school because of Buccellato's ethically questionable relationship with educational consultants.   In general, educational consultants are hired by parents to provide impartial advice as to where parents should send their troubled children to school.  Realizing the significant role consultants play in the school selection process, Buccellato showers consultants with gifts and under-the-table *de facto* bribes.  Buccellato also causes HLA to pay the traveling expenses of many consultants *and* their family members who happen to visit the Atlanta

34

metropolitan region for personal reasons. For example, HLA recently paid the travel expenses of both Leslie Goldberg, an educational consultant in Boston, Massachusetts *and* her son who is based in California, for their trip to Atlanta. Similarly, Buccellato also caused HLA to pay the travel expenses of another educational consultant based in Baton Rouge, Nancy Cadwallader, *and* her husband to visit Atlanta. In such situations, Buccellato arranges for the consultants to quickly meet him, with Hidden Lake picking up the traveling and incidental expenses of both the consultant and even the consultant's family members. Each year, Buccellato also gives expensive Christmas gifts, some totaling over $1,000, to consultants as a way of ensuring their fealty. Buccellato's close relationship with education consultants contributes both to populating HLA with students whose enrollment is directly contrary to HLA's stated admissions criteria, and has served to improperly enrich Buccellato at the expense of Plaintiffs and other Class member families.

55. Despite HLA's efforts to mislead families and omit disclosing the truth about HLA's operations, many parents do become aware of the truth concerning some aspects of the HLA experience. However, those parents are then faced with the Hobsian choice to *either* (a) abruptly withdraw their children from HLA -- in which case the families lose their non-refundable pre-paid three month tuition "deposit" and even *any* academic credit for the time their children were enrolled because HLA confers credits only if the student completes the program -- *or* (b) leave their children

35

at the academy despite the conditions there of which the parents are actually aware. Nevertheless, many parents choose at great financial and educational cost to simply withdraw their children prior to the end of the program, and thereby simply forfeit at least three months of tuition payments. Indeed, it is no coincidence that well over 50 percent of students who have attended HLA during the Class Period have failed to graduate, with many being withdrawn by parents early.

### 4.    **Improper Medical Supervision**

56.    Hidden Lake's Handbook states that it employs "a full-time nurse on staff seven days a week," and that "a pediatrician visits campus at least once a week to see students (twice a week when needed)." In fact, however, Hidden Lake until recently did not have a full-time nurse, and throughout the Class Period has not consistently employed a full-time, properly qualified nurse. Indeed, the infirmary has in the recent past been run by a former receptionist who has no medical training. Worse yet, no physician currently visits HLA on a monthly, and certainly not a weekly, basis to see students. As a result, students have received inadequate medical treatment and medical supervision.

57.    Additionally, Hidden Lake claims in its Handbook that all prescribed medication is distributed by "a nurse or another trained staff member at least four times per day," and that it enlists a staff psychiatrist, who visits "the campus on a regular basis," to evaluate students who require psychotropic medications. However,

36

throughout the Class Period Hidden Lake has not employed sufficient personnel who are actually licensed to dispense medication to students, thus forcing the school to have untrained staff such as secretaries or pharmaceutical technicians to distribute medications to students.  Indeed, Hidden Lake's recent staff psychiatrist, Consuelo Reddick, has also recently reportedly decided to no longer come to Hidden Lake's campus, and the school in the recent past has not had a properly licensed psychiatrist to evaluate students.  Reportedly, Dr. Reddick will no longer travel to the HLA campus to see students because of differences she has with HLA's administration regarding HLA's operations and services, among other things, but continues to work with some HLA students whose families are forced to pay the excessive transportation charges HLA imposes to commute those students between HLA and Dr. Reddick's office near Atlanta.

58.    Hidden Lake's staffing problems prevent the school from timely dispensing medication to its students, who are often forced to wait days to receive their medications despite the fact that such drugs must be given on a regimented basis in accordance with their instructions.  In fact, despite its staffing deficiencies, Hidden Lake has throughout the Class Period refused to hire more staff who are licensed to dispense prescription medication.  These practices also helped foster a dangerous campus environment where, among other things, mistakes have been frequently made

in the distribution of prescription medications, and where students have had access to other students' medication.

59.     Along those lines, Hidden Lake also represents that its current Director of Addiction Services, Dr. Clay Erickson, is a properly licensed physician.  In fact, however, Dr. Erickson has throughout the Class Period reportedly practiced medicine at HLA with a suspended medical license, and his license was suspended reportedly because of his own personal addiction to certain psychotropic drugs.  In particular, on April 14, 1993, the Washington State Medical Disciplinary Board first temporarily suspended Erickson's license to practice medicine because of his alleged alcoholism and abuse of controlled prescription drugs.  The Disciplinary Board found that Erickson "obtained controlled substances, including but not necessarily limited to, approximately twenty (20) Vicodin tablets, approximately twelve (12) Tylox caplets and approximately five (5) 0.5 ml morphine tubex syringes containing 10 mg/ml of morphine, in August and/or September, 1992 for his own use and without authorization or prescription."  On March 10, 1995, the Washington State Medical Quality Assurance Commission entered an order suspending Erickson indefinitely "until such time as he [would] petition[] to have the suspension lifted," and would present evidence that he has successfully undergone substance counseling and "is capable of practicing medicine with reasonable skill and safety."  On March 11, 1998, the Washington State Medical Quality Assurance Commission denied Erickson's

38

petition to lift the suspension of his medical license, ruling that Erickson had "failed to present evidence that he is currently capable of practicing medicine with reasonable skill and safety as required" by the March 10, 1995 Order. On its web site, Hidden Lake lists Erickson as having an M.D. from the University of Washington School of Medicine without also listing that his medical license has been suspended. Moreover, in addition to serving presently as HLA's "Director of Addiction Services," Erickson's duties were expanded earlier this year to include "Infirmary Supervisor" -- in effect, placing him in charge of distributing medication to students. These circumstances are particularly troubling given that a large number of Hidden Lake's students have addiction problems, and have specifically attended HLA to join a "therapeutic" environment to help combat these addictions.

### 5.    Undisclosed or Improperly Disclosed Incidental Costs

60.    Despite charging thousands of dollars per month to attend HLA and despite the fact that HLA represents this monthly payment as "all-inclusive", HLA in fact imposes on Class member families numerous additional costs. These undisclosed additional costs include, for example: excessive transportation fees for children to visit physicians off-campus, including some $25 or more to visit a physician within Dahlonega city limits and some $94 or more for children to visit physicians outside city limits; large surcharges for shipping prohibited materials which HLA sends back to parents; "processing" fees for children to actually obtain their required prescriptions while enrolled at HLA; and big undisclosed mark-ups on toiletries which HLA forces its students to obtain from HLA's on-campus store. In some instances, HLA simply fails to disclose in its Handbook that students will be charged for various incidental costs, such as a $350 graduation fee, while in other instances HLA fails to disclose that it posts huge profit mark-ups for incidental costs which in some cases can exceed 100 percent.

61.    During the Class Period alone these undisclosed charges and overcharges have reportedly totaled between $800,000 and $1,000,000. And as noted, families had no practical choice but to pay these charges, as the alternative would be simply to withdraw their children and thereby forfeit money and academic credit, or have HLA withhold transcripts and diplomas for alleged non-payment. These additional

40

undisclosed charges and overcharges can be broken down into the following categories.

### i.   Toiletries

62.   Hidden Lake has developed an extremely lucrative side business of creating an internal store to sell to students toiletries at highly inflated prices. Indeed, these overcharging practices were initiated in or about 2000, at the beginning of the Class Period. Beginning in about 2000, Hidden Lake decided that parents could no longer send toiletries to their children, and instead created an internal store where students had to purchase all toiletries. HLA purchases toiletries in bulk from Wal-Mart at low prices, and then sells them to students at prices that are marked-up an average of, and sometimes well over, 100 percent.

63.   Further, throughout the Class Period HLA's toiletries program provided Buccellato with a guaranteed source of additional profits, in that Hidden Lake does not provide students with even the most basic toiletries as part of their so-called "all-inclusive tuition", leaving students to fend for themselves. HLA throughout the Class Period has reportedly generated each year over $40,000 in revenue, and over $20,000 in pure profits, from its internal store.

## ii.     Shipping Costs

64.     Hidden Lake represents that it carefully regulates what parents may or may not send to their children, declaring that it will return all inappropriate items while imposing a "small service charge."  What Hidden Lake fails to disclose is that this "small service charge" is actually a significant surcharge that in many cases doubles HLA's actual shipping costs.  Hidden Lake generates over $10,000 a year from these shipping costs, several thousand dollars of which is because of HLA's undisclosed mark-ups.  Most parents are unaware of these overcharges, as Hidden Lake simply bills parents for shipping costs, among other things, without breaking down the service fee it charges.

## iii.     Transportation Costs for Medical Visits

65.     HLA charges parents excessive transportation fees for transporting students to and from physicians for medical visits.  In its Handbook, HLA erroneously claims that "there is a small fee for transporting students to appointments outside the Dahlonega area," even though in actuality it charges students a $25 transportation fee to visit a physician within Dahlonega, and some $94 or more in transportation fees to visit a physician outside of Dahlonega.

66.     As with HLA's undisclosed other mark-ups, these transportation costs quickly add up, especially for students with recurring medical problems, and those whose medical conditions require that they go to Atlanta for certain treatments

unavailable from local medical facilities.  Indeed, for many families these costs can end up adding hundreds or even thousands of dollars to their tuition bills, particularly in the case of students in need of frequent medical visits.  In total, Hidden Lake has billed parents during the Class Period thousands of dollars for these transportation costs which were never properly disclosed.

### iv.   Overcharging for Dental Services

67.   HLA maintains a dental clinic on its campus.  However, HLA has not received proper licenses to own and operate that clinic.  In addition, HLA has overcharged families throughout the Class Period for services its dental clinic offered.  In other instances, HLA has billed Class member families for dental services never rendered.  For instance, HLA's dental clinic has billed families for certain special cephalometric x-ray procedures to determine orthodontics treatment, despite reportedly not even having any such special x-ray machine on campus.

### v.   Graduation Fees

68.   Hidden Lake also fails to disclose that students will be assessed a fee, typically a minimum of $150 or more, with some families paying as much as $350, which is to be used to purchase a suitable outfit for graduation.  Prior to graduation, counselors take students to purchase outfits that must be worn at graduation, with students being able to spend up to the $150-$350 amount they pre-pay, for the outfit.  However, students often purchase outfits that are less than $150-$350, although

parents are still charged the full $150-$350 fee. When students inform Hidden Lake that they did not use the full $150-$350 and therefore that they are entitled to be reimbursed for the balance of the unused funds, HLA officials simply ignore these requests, refusing to refund students any money.

### vi.   **Miscellaneous Other Incidental Costs**

69.     Hidden Lake also overcharges parents for numerous incidental costs that otherwise should fall within the allegedly "all-inclusive" $5,900-plus month tuition. For instance, HLA levies an administrative fee each time it processes a student's pharmaceutical prescription of typically $10 or more (its Handbook misleadingly states only that HLA assesses administrative fees for pharmaceutical processing). As another example, although HLA's Handbook also notes generally that it will impose an "incidental administrative fee" for college applications, college courses and SAT/ACT tests, it omits that HLA does not charge parents for these items at cost, but instead also adds undisclosed mark-ups. Incredibly, HLA even overcharges students for vaccinations and shots, imposing a more than 50 percent mark-up for flu-shots and $90 for a meningitis shot that costs significantly less. During the Class Period, these additional miscellaneous overcharges have resulted in thousands of dollars of added profit for Hidden Lake.

### E.   **Buccellato's Personal Control of Hidden Lake**

44

70.     HLA's zeal to cut corners and misrepresent itself, whether by refusing to hire certified teachers, admitting inappropriate students or inappropriately billing parents for "incidental" costs, stems from the fact that it is run in significant part for the personal enrichment of its founder, defendant Buccellato.  Indeed through a variety of means, Buccellato has been able to extract millions of dollars from Hidden Lake for his personal benefit, while placing completely unqualified people -- including even his longtime companion, Kenneth Spooner -- in positions of purported authority.

71.     Defendant Buccellato acted in concert with, dominated and otherwise controlled the operations of the three HLA corporate defendants, and planned, orchestrated and executed the wrongdoing as alleged on behalf of himself individually and through the HLA entities, which Buccellato controlled and operated for his own personal benefit and as his own alter egos.  Among other things, defendant Buccellato dominated and controlled HLA's operations and finances, including the statements made to families regarding HLA's costs and services.   In addition, defendant Buccellato exercised that domination and control to facilitate and enable the misconduct that resulted in the damages suffered by Plaintiffs and the Class member families.  Accordingly, the acts and omissions of each of the HLA entities should be attributed to one another and to defendant Buccellato personally.

72.     As a result of Buccellato's control and domination over HLA, Buccellato was able to personally benefit financially from misconduct alleged in several respects.

45

The improper financial benefits Buccellato directly or indirectly received can be broken down into the following categories.

### 1.   Excessive Management Fees

73.   Buccellato runs at least two for-profit corporations -- Hidden Lake Academy, Inc., and Ridge Creek -- that have received hundreds of thousands of dollars in fees from the non-profit HLA, Inc. during the Class Period.  In 2004 alone, HLA, Inc. paid Hidden Lake Academy, Inc. approximately $1,310,471 for management services and Ridge Creek $574,655 for use of its wilderness facilities.  Hidden Lake Academy, Inc. also owns all of the land on which HLA, Inc. is located.

74.    Buccellato's control over, and the connection between, HLA, Inc., Hidden Lake Academy, Inc. and Ridge Creek is best demonstrated by the fact that all three share at least one common bank account (at Lumpkin County Bank), and their records can be accessed by Buccellato all at once.

75.    The management fees Hidden Lake Academy, Inc. obtained from HLA, Inc. at Buccellato's direction were excessive.  Further, at least a material portion of those fees were obtained directly or indirectly from Class member families as a result of the wrongdoing alleged in this Complaint.

### 2.    Loan Repayments and Taxes

76.    Since its founding in 1994, Hidden Lake has paid Buccellato's personal taxes on at least three occasions, including his 1995 federal taxes which reportedly totaled some $124,000 and/or his 1996 federal taxes which reportedly totaled some $123,000.   Likewise, Hidden Lake has routinely paid substantial amounts of Buccellato's personal loans, resulting in expenditures from the boarding school totaling in the hundreds of thousands of dollars.

77.    A material portion of the payments HLA made at Buccellato's direction and for Buccellato's personal loans and taxes were improperly obtained directly or indirectly from Plaintiffs and Class member families.

47

### 3.   **Personal Expenses**

78.   Buccellato bills a significant part, indeed at times an overwhelming majority, of his personal expenses to HLA.   These include expenses for lavish vacations, extravagant meals, gifts and other personal items, like home furnishings and cars and other vehicles.  In fact, during the Class Period Buccellato has billed to HLA at least three luxurious personal vacation packages he, Kenneth Spooner, and certain of Buccellato's nieces and nephews (specifically, Emily Buccellato, Katie Buccellato and Andrew Buccellato) reportedly took as a graduation present from Buccellato personally.  In another instance during the Class Period, Buccellato used school funds to buy a fully equipped laptop computer for his nephew.  Buccellato even bills Hidden Lake for contributions to other not-for-profit organizations.

79.   In total, Buccellato has during each year of the Class Period billed more than $100,000 of his personal expenses directly to the school.

80.   Buccellato's improper billing of HLA extends beyond credit card expenses.  For instance, Buccellato has used on multiple occasions during the Class Period HLA's food service provider to cater private affairs, often running up tabs that are in the five figures, with Buccellato directing HLA to simply pay the tab.

81.   Buccellato's control of Hidden Lake's financial and other resources is well known among certain members of the Hidden Lake community.

### 4.   **Misuse of Hidden Lake Staff**

82.   Buccellato also uses improperly school staff for his personal use. Buccellato's misuse of Hidden Lake staff runs the gamut from maintenance workers to licensed psychologists.

83.   Specifically, Buccellato has used HLA maintenance staff on at least three separate occasions to repair personal properties that he intended to either rent or sell, including in the late 1990s when he had maintenance staff paint and repair both a house he owned for rental purposes, and the house of his then-recently deceased aunt. More recently, in December 2005, Buccellato used HLA maintenance staff to repair another property set on 28 acres which he and Spooner own jointly, and which they intended to rent.  In fact, in December 2005, Buccellato reportedly sent a memo to the entire maintenance staff (including Arlen Garett, then maintenance supervisor and maintenance employees Jason Loggins and Nathan Garett, as well as the housekeeping supervisor Tina Roper and housekeeping employees Adrian White and Jessica Sanford), directing them to service that property, which is located in Lumpkin County. Buccellato has also recently used both HLA's maintenance and housekeeping staff to help maintain another property Buccellato owns in Atlanta.  In all of these instances, Buccellato did not pay HLA maintenance staff from his personal funds for completing these projects, but instead employed them during school hours, and paid them with school funds.

49

84.     Buccellato also uses psychologists who are supposedly employed by Hidden Lake to work at his private practice in Atlanta, Georgia.  Currently, or in the very recent past, Buccellato has or had arrangements specifically with both Dr. Steven Taylor and Dr. Brad Carpenter -- two psychologists presently or formerly on Hidden Lake's staff -- to work several days per week in Buccellato's private practice seeing patients.  In fact, at times during the Class Period Dr. Taylor reportedly spent up to four days a week servicing clients exclusively in Buccellato's private practice. Buccellato's misuse of Dr. Taylor and Dr. Carpenter resulted not only in additional improper revenues to Buccellato at the expense of Class member families, but also contributed significantly to the chronic deficiencies in HLA staffing for psychologists.

### 5.     Misuse of Hidden Lake Students

85.     In addition to misusing HLA personnel and professional resources, Buccellato and HLA have also misused students, particularly those on restrictions, by having them do manual labor on HLA properties.  For instance, Buccellato has reportedly used recently several students to help clear land on a property near HLA which Buccellato planned to develop.  Similarly, Defendants also recently solicited funds to build a stable for HLA; reportedly, whether from diversion of the funds or a shortage of proceeds raised, the fund did not raise enough money and Defendants instead have used restricted students to help build the stables.  Buccellato has also used students, including the Plaintiffs, to clear land, dig ditches, dig trenches for a

swimming pool, and otherwise do the work of HLA staff members whose employment he has eliminated.

86.   Buccellato's use of students to do HLA manual labor was similarly not disclosed to families at the time they entered into their enrollment contracts.  Further, Defendants' misuse of such students to do manual labor violates countless federal and state labor regulations.   Moreover, these practices have resulted from simple economics:  by using students to do this work, Defendants employ less staff and thereby make more money.

### 6.   Student Chapel Fund

87.   In its Handbook, HLA urges Class member families to make donations to a Student Chapel Fund, stressing that Hidden Lake is "committed in [its] belief in the importance of faith, worship and reverence in the personal growth of our students.  The building of a campus chapel that will represent all students [sic] faiths in an integral core of our future growth, and important to the continued spiritual growth of our students."

88.   Many Class member families have made such additional contributions.

89.   In fact, however, Buccellato has taken funds directly from the Student Chapel Fund program for his own personal use.  Indeed, thousands of dollars from that Fund are now reportedly missing.  In fact, some members of the Hidden Lake

51

community doubt if there is currently any money in the Student Chapel Fund or even if HLA ever intended to devote those funds to establish a student chapel.

### 7.   **Kenneth Spooner**

90.   Buccellato has used his multiple positions of authority, control and domination of the HLA entities to appoint his long-time companion, Kenneth Spooner, to the posts of CEO, CFO, Secretary and Board Chairman of HLA, Inc., the not-for-profit corporation that actually operates the boarding school.  Not surprisingly, Spooner has not independently exercised authority but instead has deferred to Buccellato regarding the operations of the boarding school.  Spooner knew or ignored that Buccellato has throughout the Class Period improperly operated HLA by, among other things, using HLA's financial and human resources for Buccellato's own personal use, yet has permitted Buccellato to engage in this conduct.  Indeed, Spooner has actually directly or indirectly participated in and received the benefits from Buccellato's violations, accompanying Buccellato on several lavish vacations and extravagant meals at HLA's -- and ultimately the Class member families' -- expense, including the three infamous vacations Buccellato took certain of his nieces and nephews on as graduation gifts described above.

91.   Spooner's fealty to Buccellato is best demonstrated by the fact that Buccellato has repeatedly forged Spooner's signature on important documents related to HLA, Inc., with Spooner's full knowledge.  For instance, Buccellato has reportedly

52

forged Spooner's signature on several Internal Revenue Service ("IRS") forms HLA filed during the Class Period, including IRS Form 990's HLA filed as recently as for tax years 2005 and 2004, as well as various loan and loan extension documents for loans HLA has obtained from local banks, including First Cherokee State Bank (one of HLA's primary lenders), a loan extension granted by Lumpkin County Bank, and another loan to HLA by Nexity Bank. Along these lines, HLA's long-time outside law firm, Quirk & Quirk, reportedly is or should be aware of Spooner's duties to execute properly HLA documents, and reportedly even represented one of those bank lenders at the same time it was representing HLA. In fact, for purposes of allegedly complying with IRS regulations the checks Spooner purportedly "signs" on behalf of HLA are not in reality actually signed by Spooner at all, but instead are executed by Buccellato via a "stamp" representing Spooner's signature. Moreover, Buccellato negotiates all contracts with suppliers, and makes virtually all decisions related to the boarding school, no matter how mundane, leaving Spooner with no real power.

92. Buccellato has also placed Spooner as Chairman of HLA, Inc.'s nominal Board of Directors, whose other two members are Spooner's sister and father. The Board rarely meets, and when it does the meetings are *pro forma* lasting only a few minutes. Board members do not question, let alone challenge Buccellato, who is free to operate the boarding school however he

53

wants.  In doing so, Spooner appears to have abdicated improperly his duties as a

director under Georgia law, and contributed to the violations alleged.[1]

---

[1]  Plaintiffs have not named Spooner as a defendant in this Complaint.  Plaintiffs reserve the right to add Spooner and other persons as defendants in this action in an amended complaint, subject to the results of their continuing investigations.

54

93.     Spooner's allegiance to Buccellato and the Board's overall ineffectiveness has contributed to enabling Buccellato to run Hidden Lake as his personal fiefdom, commit the financial and other violations alleged, convert school resources for personal expense, place unqualified people in positions of authority, hire unqualified teachers and peer counselors and betray the trust placed unto him and Hidden Lake by parents, students and education authorities alike.

### F.   The Exculpation, Attorney Fee Shifting and Indemnification Clauses in Hidden Lake's Contract Are Unconscionable and Unenforceable

94.   As stated above, Hidden Lake's standard form enrollment agreement contains an unconscionably broad and unenforceable release which, in pertinent part, purports to release not only Hidden Lake, but also "its officers, directors, shareholders, employees, attorneys and agents from *any and all* claims ...." (emphasis added).  In addition and also as set forth above, Hidden Lake's standard form enrollment agreement also contains provisions requiring Class member families to indemnify HLA "from *any and all* damages, judgments, costs and attorney's fees", and to pay "*all* costs, expenses and attorney's fees incurred by HLA which shall be billed to the Parent(s)/Guardian(s) and/or Guarantor and become part of the tuition and fees under the terms of this Agreement."  (emphasis added)

95.   The exculpation, indemnification and attorney fee shifting provisions in HLA's standard form contract are unconscionable and invalid and should be declared unenforceable in the circumstances here.  In particular, those clauses are invalid because parents were wrongfully induced into agreeing to them as a direct and proximate result of the misrepresentations and omissions of material fact which Defendants issued initially to induce Class member families to enroll their children at HLA, and as a result of Defendants' continuing improper acts thereafter; because those clauses are so one-sided in HLA's favor as to be both procedurally and substantively

unconscionable; because those clauses do not apply whatsoever following the time that students are no longer enrolled at HLA; because as fiduciaries the Defendants are precluded from providing for the students to release, in advance, "any and all claims" the student may have against the Defendants; and because in view of the facts and misconduct as alleged, it would be inequitable to enforce these clauses as those clauses should be declared void *ab initio* in the circumstances of this case.

## FIRST CAUSE OF ACTION

### (Against Defendant HLA, Inc. for Breach of Contract)

96.     Plaintiffs incorporate by reference each paragraph set forth above.

97.     Plaintiffs assert this claim individually and on behalf of the Class against defendant HLA, Inc.

98.     Defendant HLA, Inc. (d/b/a Hidden Lake Academy) is the formal party to the contracts entered into by Plaintiffs and the members of the Class pursuant to which Plaintiffs and the Class enrolled their children at HLA.

99.     HLA, Inc. entered into, and duly executed, contracts with the legal guardians of each student who attended the school.  In accordance with the terms of those agreements, Plaintiffs and the members of the Class paid tuition to Hidden Lake.

100.   The material terms of the contracts entered into by Plaintiffs and the members of the Class were uniform.

101.   Among other things, the contracts required that Hidden Lake "[p]rovide an education commensurate with the Student's abilities and capacities" and "adequate room and board facilities."   Accordingly, Hidden Lake was required to provide an adequate education and room and board consistent with its contractual obligations.   As part of those obligations, Hidden Lake was required to employ qualified teachers, counselors, nurses, certified learning disability specialists, and a properly licensed director of addiction services, and was also required to not use untrained staff to distribute to students prescription medication or to accept students for enrollment who were either "court ordered," "violent" or "severely disturbed", among other things. The contract also set out the fee Class member caregivers would pay to enroll their children at Hidden Lake which was represented in HLA's marketing materials to be "all-inclusive", among other things.

102.   Hidden Lake breached its contractual obligations by providing students with deficient educational and therapeutic services and inadequate medical and other monitoring and room and board.   Specifically, Hidden Lake, among other things, employed uncertified teachers, peer counselors with no masters' degrees or with degrees in areas unrelated to psychology, education or social work who had received little if any clinical training, untrained staff who were responsible for distributing to students prescription medications, and an individual as Director of Addiction Services (Clay Erickson) whose license had been suspended because of his own addiction to

various psychotropic drugs.  In addition, Hidden Lake also did not readily employ full-time nurses who could properly dispense medication, or properly certified learning disability specialists; accepted and enrolled several students during the Class Period who were either "court ordered," "violent" or "severely disturbed"; and imposed excessive charges and overcharges for numerous incidental items, all as alleged more fully above.

103.   As a direct and proximate result of HLA, Inc.'s contractual breaches, Plaintiffs and the members of the Class were injured.

104.   The contractual breaches by HLA, Inc. were a substantial, direct and proximate cause of the damages suffered by Plaintiffs and the members of the Class.

105.   By reason of the foregoing, HLA, Inc. is liable to Plaintiffs and the members of the Class for the substantial damages it caused in an amount to be established at trial.

## SECOND CAUSE OF ACTION

### (Against Defendants HLA, Inc. for Breach of the
### Implied Covenant of Good Faith and Fair Dealing)

106.   Plaintiffs incorporate by reference each paragraph set forth above.

107.   Plaintiffs assert this claim individually and on behalf on behalf of the Class against defendant HLA, Inc.

108.   Defendant HLA, Inc. (d/b/a Hidden Lake Academy), as the party to the standard form enrollment contracts entered into by Plaintiffs and the members of the Class, was obligated to act in good faith, to deal fairly, and to adhere to the terms and spirit of its contract with Plaintiffs and the members of the Class, as the law has long recognized that an implied covenant of good faith and fair dealing exists between parties to a contract.  These obligations included, among other things, that HLA, Inc. act in accordance with the representations Hidden Lake made to Plaintiffs and other Class member families concerning the educational offerings and therapeutic services of HLA and that, as the parties' contract states, that HLA "[p]rovide an education commensurate with the Student's abilities and capacities" and "adequate room and board facilities."  Accordingly, Hidden Lake was obligated, among other things, to employ certified teachers and peer counselors with master's degrees in areas related to psychology, education, social work and counseling; to employ a full-time, properly certified nurse and a properly licensed learning disability specialist; to use properly trained and supervised staff to dispense to students prescription medication; to not

60

admit students who were either "court ordered," "violent" or "severely disturbed"; and to not improperly charge and overcharge Class member families for numerous incidental items.

109.   Defendant HLA, Inc. breached its implied covenant of good faith and fair dealing that accompanied its performance and obligations under those contracts by misrepresenting and failing to disclose material facts concerning the operations of Hidden Lake Academy, by not employing the requisite personnel it stated it would employ, and by improperly charging and overcharging Class member families for numerous incidental items, all as alleged more fully above.

110.   The breaches of the implied covenant of good faith and fair dealing by defendant HLA, Inc. were a substantial, direct and proximate cause of the damages suffered by Plaintiffs and the members of the Class.

111.   By reason of the foregoing, defendant HLA, Inc. is liable to Plaintiffs and the members of the Class for the substantial damages it caused in an amount to be established at trial.

## THIRD CAUSE OF ACTION

### (Against All Defendants for Violating
### Georgia's Fair Business Practices Act)

112.   Plaintiffs incorporate by reference each paragraph set forth above.

113.   Plaintiffs assert this claim individually and on behalf of the Class against all Defendants.

114.   Plaintiffs bring this claim pursuant to Georgia's Fair Business Practices Act, O.C.G.A. § 10-1-390 *et seq.* (the "FBPA"). In violation of the FBPA, Defendants employed deceptive acts and practices by making numerous false claims and by omitting to timely and accurately disclose numerous material facts concerning Hidden Lake Academy, thereby causing Plaintiffs and the members of the Class ascertainable losses, all as alleged more fully above.

115.   Plaintiffs and the members of the Class are consumers within the meaning of the FBPA. Among other things, Defendants' practices were addressed to the market generally and/or otherwise implicate consumer protection concerns and thus fall within the FBPA.

116.   Unfair methods of competition and unfair or deceptive acts or practices are defined and declared unlawful in the FBPA, O.C.G.A. § 10-1-393. The unfair or deceptive acts or practices as defined in O.C.G.A. § 10-1-393(a) include, without limitation, "unfair or deceptive acts or practices in the conduct of consumer transactions and consumer acts or practices in trade or commerce ...."

62

117.   Defendants violated the FBPA, including without limitation O.C.G.A. §§ 10-1-393(a) and (b)(9), by making false, deceptive and misleading misrepresentations and by omitting to disclose material facts concerning the education, therapeutic services, operations and costs of HLA.  Specifically, Defendants misrepresented or failed to disclose, among other things:  that Hidden Lake's classes are led by uncertified teachers; that many peer counseling groups are led by counselors with master's degrees in areas unrelated to psychology, education or social work and who have little clinical training; that Hidden Lake accepts students who are either "court ordered," "violent" or "severely disturbed"; that Hidden Lake does not employ a full-time, properly certified nurse; that Hidden Lake uses untrained, unlicensed staff to distribute prescription medication to students; that Hidden Lake does not employ a properly licensed learning disability specialist; and that Hidden Lake charges and overcharges students for numerous incidental charges, all as alleged more fully above.

118.   Unfair or deceptive acts or practices as defined in O.C.G.A. § 10-1-393(b)(9) include, among other things, "advertising goods or services with intent not to sell them as advertised."

119.   Defendants' unlawful, unfair and/or deceptive practices as alleged are continuing and widespread in nature.  Plaintiffs and the members of the Class have been damaged as a proximate result of Defendants' improper course of conduct and violations of the FBPA, in an amount to be determined at trial.

## FOURTH CAUSE OF ACTION

### (Against Defendants for Unjust Enrichment
### on Behalf of Plaintiffs and Class Members)

120.   Plaintiffs incorporate by reference each paragraph set forth above.

121.   Plaintiffs assert this claim individually and on behalf of the Class against all Defendants.

122.   As a result of Defendants' improper acts and practices alleged herein, Plaintiffs and the members of the Class were misled and harmed regarding HLA's education, therapeutic services, operations and costs and also were charged for, and paid, numerous improper incidental costs.

123.   Defendants knew that Plaintiffs and the members of the Class would rely on Defendants' acts and representations, and Plaintiffs and the members of the Class did so rely.

124.   By virtue of Defendants' misrepresentations and improper acts as alleged more fully above, Plaintiffs and the members of the Class were injured.

125.   Defendants have benefitted from, and have been unjustly enriched at the expense and to the detriment of, Plaintiffs and the members of the Class, and have been unjustly enriched thereby.

126.   It would be inequitable for Defendants to be permitted to retain the benefits by which they have been unjustly enriched.   Accordingly, the improper benefits Defendants have obtained should, in the alternative and to the extent relief is

64

for any reason denied to Plaintiffs and the Class in connection with the other claims Plaintiffs have asserted, be returned to Plaintiffs and the Class.

## BASIS OF ALLEGATIONS

Plaintiffs make the foregoing allegations on information and belief based on their own investigation and the investigation of Plaintiffs' counsel which included, among other things, a review of documents relating to Hidden Lake including state and other regulatory filings by the Defendants, on-line databases and other computer research and other documents and information, and interviews with persons with relevant knowledge of the facts. Plaintiffs believe that additional evidentiary support will exist for their allegations after they are afforded a reasonable opportunity for discovery.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs on behalf of themselves and the Class, pray for the following relief:

a.    declaring this action to be a class action properly maintained on behalf of the Class under Rules 23(a) and (b) of the Federal Rules of Civil Procedure and certifying Plaintiffs as the Class representatives thereof;

b.    finding that Defendants have violated the law as alleged;

c.    awarding Plaintiffs and the members of the Class damages, including but not limited to compensatory, treble and punitive damages, together with interest thereon, to the maximum extent permitted by law;

d.    awarding Plaintiffs and the members of the Class their costs and expenses of this litigation, including but not limited to reasonable attorneys' fees, experts' fees and other costs and disbursements;

e.    declaring unenforceable the provisions in Hidden Lake's standard form enrollment contract with Plaintiffs and the members of the Class which purports to i) absolve Hidden Lake and other persons of "any and all" legal liability, ii) shift to Plaintiffs and the Class the obligation to pay HLA's attorney fees and expenses, and iii) require Plaintiffs and the members of the Class to indemnify Hidden Lake for "any and all" liabilities;

66

f.      declaring that defendant Buccellato so controls and dominates the various defendant Hidden Lake entities that the corporate veils of such entities are pierced such that Buccellato may be held personally liable;

g.      ordering an accounting of all funds Hidden Lake directly or indirectly paid to or for the benefit of defendant Buccellato during the Class Period;

h.      imposing a constructive trust upon all monies and assets Defendants have acquired from Plaintiffs and the members of the Class as a result of Defendants' violations;

i.      enjoining Defendants from committing any future violations and requiring Defendants to conform their educational offerings and services to the actual representations HLA has made regarding those offerings and services; and

j.      awarding Plaintiffs and the members of the Class such other and further relief as this Court may deem just and proper.

## **DEMAND FOR TRIAL BY JURY**

Plaintiffs demand a trial by jury of all issues so triable.


[SIGNATURES ON NEXT PAGE]

Respectfully submitted this 11th day of September, 2006.

GORBY, REEVES & PETERS, P.C.

Michael J. Gorby
(Georgia Bar No. 301950)
Mary Donne Peters, Esq.
(Georgia Bar No. 573595)
Patrick R. Kelly
(Georgia Bar No. 413030)
*Attorneys for Plaintiffs J.O.R. and*
*R.R. and D.M. and R.B., Individually*
*and on Behalf of Others Similarly*
*Situated*

Two Ravinia Drive, Suite 1500
Atlanta, GA  30346-2104
Telephone:  (404) 239-1150
Fax:  (404) 239-1179

Of Counsel:

Berger & Montague, PC
Merrill J. Davidoff
Lawrence J. Lederer
Lane L. Vines
David Anziska
1622 Locust Street
Philadelphia, PA 19103
Telephone:  (215) 875-3000
Telecopy:  (215) 875-4604

68

# IN THE UNITED STATES COURT

## FOR THE NORTHERN DISTRICT OF GEORGIA

### GAINESVILLE DIVISION

-------------------------------------------------------------------------

J.O.R. and R.R. and D.M. and R.B., :
Individually, and On Behalf of      :
Others Similarly Situated,          :
                                    :
           Plaintiffs,              :      Civil Action No. _____
                                    :      Complaint - Class Action
           -v-                      :
                                    :
HIDDEN LAKE ACADEMY,                :
INC., HLA, INC.,                    :      Plaintiffs Demand A
HIDDEN LAKE FOUNDATION,             :      Trial By Jury On All
INC., and DR. LEONARD               :      <u>Issues Triable By Jury</u>
BUCCELLATO                          :
                                    :
           Defendants.              :

-------------------------------------------------------------------------

## <u>CERTIFICATION</u>

Counsel for Plaintiffs hereby certify that the text of this document has been prepared with Times New Roman 14 point, one of the fonts and point selections approved by the Court in Local Rule 5.1B.

This 11th day of September, 2006.

GORBY, REEVES & PETERS, P.C.

Michael J. Gorby
(Georgia Bar No. 301950)
Mary Donne Peters, Esq.
(Georgia Bar No. 573595)
Patrick R. Kelly
(Georgia Bar No. 413030)
*Attorneys for Plaintiffs J.O.R. and
R.R. and D.M. and R.B., Individually
and on Behalf of Others Similarly
Situated*

Two Ravinia Drive, Suite 1500
Atlanta, GA  30346-2104
Telephone:  (404) 239-1150
Fax:  (404) 239-1179