# IN THE UNITED STATES COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
## GAINESVILLE DIVISION

```
-----------------------------------------------------
                                      :
JILL RYAN AND RON RYAN,               :
DOFF MEYER AND ROBIN BRECKER,         :   No. 2:06-CV-0146(WCO)
WALTER COLES,                         :
THERESA PINES,                        :
DR. EDWARD ROBERSON AND               :
MADELEINE ROBERSON,                   :
individually and on behalf of others  :
similarly situated,                   :
                                      :   Second Amended
                                      :      Complaint
                                      :
                  Plaintiffs,         :
                                      :   Class Action
                                      :
        -against-                     :
                                      :
HIDDEN LAKE ACADEMY, INC.,            :
HLA, INC.,                            :   Plaintiffs Demand A
HIDDEN LAKE FOUNDATION, INC., and     :   Trial By Jury On All
DR. LEONARD BUCCELLATO,               :   Issues Triable By Jury
                                      :
                  Defendants.         :
                                      :
-----------------------------------------------------
```

## SECOND AMENDED CLASS ACTION COMPLAINT

Plaintiffs Jill Ryan and Ron Ryan, Doff Meyer and Robin Brecker, Walter

Coles, Theresa Pines, and Dr. Edward Roberson and Madeleine Roberson

(collectively, "Plaintiffs"), individually and on behalf of a class of other similarly

situated persons described below, file this Second Amended Class Action Complaint against defendants Hidden Lake Academy, Inc., HLA, Inc., Hidden Lake Foundation, Inc. and Dr. Leonard Buccellato (collectively, "Defendants"). Unless otherwise indicated, Hidden Lake Academy, Inc., HLA, Inc., and Hidden Lake Foundation, Inc. are collectively referred to as "HLA" or "Hidden Lake".

## NATURE OF ACTION

1. This case is about the tragic mistreatment of troubled teenage students and their families by a private residential boarding school and its founder and principal, Dr. Leonard Buccellato ("Buccellato").

2. Hidden Lake touts itself as a "therapeutic boarding school" geared to high school-aged students typically between the ages of 12-18 who exhibit oppositional-defiant behavior, low self-esteem, depression, alcoholism, drug addiction, attention deficit disorder, deteriorating family relationships and other social deficits. HLA offers a 17-21 month comprehensive program supposedly blending therapy, counseling and education aimed at modifying its students' troubled behavior. HLA holds itself out as one of the foremost such programs in the country. The families and other caregivers of these children, in turn, pay HLA

thousands of dollars per month -- currently over $5,900 per month -- in what is represented by HLA to be "an all-inclusive tuition".

3.     To attract such students and their families to the program, HLA has made a number of written representations regarding HLA's costs, operations and educational and therapeutic offerings. Families were told via HLA's parent Handbook, website, and other marketing and promotional materials, among other things:

> that "academic classes are led by state certified teachers who are supported in their work by a certified learning disability specialist"; that "all counseling staff are full time and are clinically trained, holding a master's degree or higher"; that HLA employs "a full-time nurse on staff seven days a week"; that "prescription medications are distributed by a nurse or another trained staff member four times per day"; and that its "students are not court ordered and do not include violent or severely disturbed children." All of these claims are meant to lend Hidden Lake an air of exclusivity -- i.e., that parents are sending their children to a nurturing and safe "therapeutic" environment which differs fundamentally from other schools meant for troubled teens, and which is commensurate with the high charges parents pay for the program.

4.     However, beginning in 2000 and extending through the present (the "Class Period"), the reality of HLA belies those representations. In fact,

3

throughout the Class Period a large number and, at certain times, an overwhelming majority, of HLA's teachers have not been certified, while a sizeable number of the counseling staff lack bachelor's or master's degrees in areas related to social work, counseling, or psychology, and have not been clinically trained in counseling or social work. HLA has also during the Class Period only rarely employed a licensed learning disability specialist, and within the past several months or longer has not even employed a registered or properly licensed nurse. Hidden Lake also provides students with deficient medical supervision, allowing unlicensed staff such as secretaries and pharmaceutical technicians who are unsupervised by a nurse or proper medical authority to dispense prescription medication to students, and even uses students improperly to do manual labor around HLA's premises to save money on employing sufficient HLA staff.

5.     Further, during the Class Period HLA has also enrolled a number of "court-ordered," "violent" or "severely disturbed" students. The enrollment of these children has led, among other things, to several incidents during the Class Period in which students have been violently assaulted by other students -- the precise opposite of the "therapeutic" mission the school tells families it follows. Indeed, an internal HLA email sent in February 2006 by Clarke Poole, HLA's

4

former Director of Admissions during the period January 2000 through March 2006, to HLA's current Director of Admissions (and Public Relations), Nicole Fuglslang, detailed the exploits of three of these students, including one female student who sexually assaulted another female student, and two male students -- who *both* reportedly were referred to the school by defendant Buccellato himself despite the clear risks these children posed -- who brutally attacked other students. Further, because of the violent and anti-social behavior of some of the students that Hidden Lake accepts, the school has made it a standard practice during the Class Period to strip-search students purportedly as a safety measure, another fact not disclosed sufficiently by HLA to parents prior to the enrolling of their children.

6.     HLA has also misrepresented that the monthly tuition it charges, which parents have to pre-pay in full in advance, is "an all-inclusive tuition". In fact, throughout the Class Period HLA has charged families numerous incidental costs and also imposed big undisclosed profit mark-ups for many other items which in some cases exceeded 100 percent. For example, HLA charges students excessive transportation fees for "off-site" visits to physicians both locally in Dahlonega and in the Atlanta area; assesses a $10 fee for "processing" students' prescription medication; imposes shipping surcharges on packages that HLA sends

5

back to parents; levies a graduation fee of $150 or more (with some families paying $350) which all students must pay ostensibly to purchase a graduation outfit; obtains large, undisclosed mark-ups on toiletries and supplies that all students must purchase from its internal store; and significantly overcharges on other items, such as SAT/ACT tests, college applications and required vaccinations.

7.     During the Class Period alone, these undisclosed overcharges have reportedly totaled some $800,000-$1,000,000, all of which amounted to pure profit to HLA.  Parents have no choice but to pay these charges not only for fear of reprisal against their children enrolled at HLA, but also because if they were to withdraw their children from HLA before completion of the program, they would have to forfeit the final three months of non-refundable tuition they pre-pay (well over $15,000), *and* their children would not earn *any* academic credit, which can be earned only upon graduation from the full program.  Indeed, HLA has reportedly withheld recently a transcript from at least one family over an outstanding balance of just $8.95.  Nevertheless, despite the fact that parents incur huge educational and financial costs for pulling out their children before graduation, more than 50% of HLA's students during the Class Period -- nearly

400 families total -- have failed to graduate from HLA, and instead have left the program prematurely.

8.      HLA's zeal to cut corners and misrepresent itself stems from the fact that it is run in large part for the personal enrichment of its founder, defendant Buccellato. Buccellato dominates all of the HLA entities, including both the for-profit Hidden Lake Academy, Inc. and the not-for-profit HLA, Inc. and Hidden Lake Foundation, Inc. Buccellato's control over HLA is well-known amongst the HLA community. Hidden Lake Academy, Inc. receives hundreds of thousands of dollars in "management fees" from HLA, Inc., the bulk of which is distributed in turn straight to Buccellato, who is CEO, CFO and Secretary of the for-profit corporation. Buccellato uses HLA, Inc. as his personal bank and employment agency by, among other things: billing to it significant amounts of his personal expenses, including extravagant dinners, gifts to friends and family, and lavish vacations totaling thousands of dollars; using school maintenance staff to maintain and repair personal rental properties; having the school pay his personal taxes and service his loan payments; arranging for present or former school therapists, such as Dr. Steven Taylor and Dr. Brad Carpenter, to work up to four days per week in his private psychology practice; enlisting school employees to work part-time at St.

Francis Day School, a school that Buccellato also helps operate; and getting the school's food service provider to privately cater personal affairs, which he then bills to the school. Buccellato also arranges for HLA to pay hundreds of thousands of dollars each year to Ridge Creek, Inc. ("Ridge Creek"), a for-profit corporation he founded in 2001 which is located adjacent to HLA, and whose property is mostly owned by Hidden Lake Academy, Inc. and HLA, Inc.

9.      Buccellato has placed his long-time companion, Kenneth Spooner, as HLA, Inc.'s CEO, CFO and Secretary. Spooner also serves as HLA, Inc.'s Board Chairman, while Spooner's sister, Diane Cooper, and Spooner's father, Robert Spooner, serve as the other two Board directors. In reality, however, Buccellato dominates all aspects of HLA, Inc.'s affairs, making almost every school-related decision unilaterally, with the Board of Directors rarely meeting or, when it does meet, engaging in only perfunctory meetings. Indeed, Buccellato has reportedly even gone to the extent of forging Spooner's signature on certain school-related documents, such as contracts, tax returns, and loan documents between HLA and its lenders, including First Cherokee State Bank, Lumpkin County Bank and Nexity Bank, among other things, as Spooner was not present to sign the documents.

10.     In addition to falsely touting its costs and operations, another reason why Hidden Lake has been so successful in recruiting students to the school is because of Buccellato's close -- and, in certain instances ethically questionable -- relationship with education consultants.  In general, education consultants are hired by parents to provide impartial advice as to where parents should send their troubled children to school.  Realizing the significant role consultants play in the school selection process, Buccellato showers consultants with gifts and other forms of undisclosed compensation.  For example, Buccellato pays the traveling expenses of many consultants *and* even the consultant's family members who happen to visit the Atlanta metropolitan region for personal reasons.  In such situations, Buccellato arranges for the consultants to quickly meet him, with Hidden Lake picking up the consultant's traveling and incidental expenses.  Each year, Buccellato also gives expensive Christmas gifts, some totaling over $1,000, to consultants as way of ensuring their fealty.

11.     Plaintiffs enrolled their children at HLA during the Class Period, and were injured by the misconduct alleged in this amended complaint.  Plaintiffs bring this action against Buccellato and the HLA Defendants individually and on behalf of a class of similarly situated families whose children were enrolled at HLA

during the Class Period. Plaintiffs' claims arise under the Georgia Fair Business Practices Act and Georgia common law. Plaintiffs seek damages, restitution and injunctive relief.

## JURISDICTION AND VENUE

12. This Court has jurisdiction over the subject matter of this action under 28 U.S.C. § 1332 because the matter in controversy is in excess of $5 million, exclusive of interest and costs; the matter is a class action in which at least one member of the class is a citizen of a state different from any Defendant; and the aggregate size of the proposed Class is believed to be greater than 100 members.

13. Venue is proper in this District pursuant to 28 U.S.C. § 1391(a) and (c). The misconduct alleged was carried out, in significant part, within the Northern District of Georgia; all of the Defendants conduct business and engage in interstate commerce in the Northern District of Georgia; and all of the Defendants reside in Georgia.

## PARTIES

14.   a.   Plaintiffs Jill Ryan and Ron Ryan are the parents of T.R. T.R. attended Hidden Lake between November 2004 and May 2005. Plaintiffs Jill Ryan and Ron Ryan are residents of Florida. In total, plaintiffs Jill Ryan and Ron Ryan

paid HLA over $63,268, including a non-refundable deposit of $14,550, for the final three months of tuition.

   b.    Plaintiffs Doff Meyer and Robin Brecker are the parents of C.B. C.B. attended Hidden Lake from February 2005 to August 2006. Plaintiffs Doff Meyer and Robin Brecker are residents of Pennsylvania. In total, plaintiffs Doff Meyer and Robin Brecker paid HLA over $102,727, including a non-refundable deposit of $14,709, for the final three months of tuition.

   c.    Plaintiff Walter Coles is the grandparent of A.C. A.C. attended Hidden Lake from November 2004 to May 2005. Plaintiff Walter Coles is a resident of North Carolina. In total, plaintiff Walter Coles paid HLA over $42,948, including a non-refundable deposit of $16,158, for the final three months of tuition.

   d.    Plaintiff Theresa Pines is the parent of S.P. S.P. attended Hidden Lake from August 2005 to August 2006. Plaintiff Theresa Pines is a resident of Maryland. In total, plaintiff Theresa Pines paid HLA over $76,601, including a non-refundable deposit of $14,025, for the final three months of tuition.

   e.    Plaintiffs Dr. Edward Roberson and Madeleine Roberson are the parents of L.R. L.R. attended Hidden Lake from May 2002 to May 2004. Plaintiffs Dr. Edward Roberson and Madeleine Roberson are residents of

Colorado. In total, plaintiffs Dr. Edward Roberson and Madeleine Roberson paid

HLA over $128,330, including a non-refundable deposit of $15,388, for the final

three months of tuition.

       f.     In deciding to send their children to Hidden Lake, Plaintiffs

directly and indirectly relied on Defendants' representations concerning HLA,

including those set forth in Hidden Lake's Handbook, website and other materials.

Plaintiffs began learning the truth concerning Hidden Lake in or about February of

2006.

15.    Hidden Lake Academy, Inc. is a for-profit corporation that is

incorporated in Georgia and has its principal place of business at 830 Hidden Lake

Road, Dahlonega, Georgia 30533. Its CEO, CFO and Secretary is Buccellato.

16.    HLA, Inc. is a not-for-profit corporation that is incorporated in

Georgia and has its principal place of business at 830 Hidden Lake Road,

Dahlonega, Georgia 30533. Its CEO, CFO and Secretary is Kenneth Spooner, and

its President is Buccellato. Its Board of Directors consists of Kenneth Spooner,

Spooner's father, Robert Spooner, and Spooner's sister, Diane Cooper.

17.    Hidden Lake Foundation, Inc. is a not-for-profit corporation that is

incorporated in Georgia and has its principal place of business at 830 Hidden Lake

Road, Dahlonega, Georgia 30533. Its CEO, CFO and Secretary is Kenneth Spooner, and its primary business purpose is to raise money for HLA, Inc.

18.     Buccellato is a resident of the state of Georgia, and currently resides at 3390 Peachtree Road, Atlanta, Georgia 30326, among other properties. He is the founder and President of HLA, Inc., and is the CEO, CFO and Secretary of Hidden Lake Academy, Inc. Buccellato is also the founder and CEO, CFO and Secretary of Ridge Creek, Inc., a for-profit corporation founded in 2001 which operates a "wilderness boot camp" for more severely troubled teens that is a "sister" school to HLA, and the CEO of St. Francis Day School, Inc., a not-for-profit corporation which operates a private school geared towards children with learning disabilities.

## CLASS ACTION ALLEGATIONS

19.     Plaintiffs bring this action pursuant to Rules 23(a) and (b)(3) of the Federal Rules of Civil Procedure on behalf of themselves individually and all other persons who, during the Class Period January 1, 2000 though the present, paid money to send their children to Hidden Lake Academy (the "Class"). Excluded from the Class are the Defendants, any entity in which the Defendants have a controlling interest, any employees, officers, or directors of the Defendants, and their legal representatives, heirs, successors and assignors.

20. The members of the Class are so numerous that joinder is impracticable under Fed. R. Civ. P. 23(a)(1). The Class is believed to include at least hundreds of families. The precise number of Class members and their addresses can be readily determined from records of the Defendants. Class members may be notified of the pendency of this action by mail, supplemented (if deemed necessary by the Court) by published notice.

21. Common questions of law and fact exist and predominate in this action as to all Class members under Fed. R. Civ. P. 23(a)(2) and (b)(3). The common legal or factual questions include, among others:

a. whether Hidden Lake made numerous misrepresentations to Plaintiffs and the other members of the Class during the Class Period, including with respect to HLA's teachers, counselors, supervision of the students, the types of students HLA admits and HLA's costs, among other things;

b. whether Hidden Lake omitted to disclose to Plaintiffs and the members of the Class numerous material facts concerning HLA's education, operations and costs, including but not limited to the fact that students are routinely strip-searched and that Hidden Lake charges and overcharges students for such

incidental costs as prescription medications, graduation fees, vaccinations, toiletries, transportation for visits to physicians, shipping costs and other items;

c.     whether Plaintiffs and the members of the Class similarly relied on Defendants' misrepresentations and material omissions;

d.     whether defendant Buccellato controlled and dominated the various Hidden Lake entities such that the Court should pierce the corporate veils of those entities and hold Buccellato personally liable;

e.     whether Defendants breached their duties to Plaintiffs and the members of the Class;

f.     whether the exculpatory, attorney fee shifting and indemnification clauses in Hidden Lake's standard form enrollment contracts with parents should be declared unenforceable;

g.     whether Plaintiffs and the members of the Class sustained damages as a result of Defendants' misconduct and the appropriate measure of such damages; and

h.     whether Plaintiffs are entitled to damages, restitution and injunctive relief.

22.     Plaintiffs are adequate representatives of the Class under Fed. R. Civ. 23(a)(4) because their interests are squarely aligned with the interests of the members of the Class they seek to represent. Plaintiffs have retained counsel competent and experienced in conducting complex class action litigation. Plaintiffs and their counsel will adequately protect the interests of the Class.

23.     A class action is superior to other available means for the fair and efficient adjudication of Plaintiffs' claims under Fed R. Civ. P. 23(b)(3). The damages suffered by individual Class members may be relatively small in view of the burden and expense of individually prosecuting those claims. Accordingly, it would be impracticable for Class members to individually redress the wrongs done to them and would result in a multiplicity of lawsuits related to the same underlying alleged wrongful acts and practices. Individualized litigation would also increase the delay and expense to all parties and the judiciary presented by the complex legal and factual issues of the case. By contrast, the class action device presents far fewer management difficulties, and provides the benefits of a single adjudication, economy of scale and comprehensive supervision by a single court.

24.     In addition, the Class should also be certified under the provisions of Fed. R. Civ. P. 23(b)(1) and 23(b)(2) because:

16

a.      the prosecution of separate actions by individual Class members would create a risk of inconsistent or varying adjudications with respect to individual Class members which could establish incompatible standards of conduct for Defendants;

b.      the prosecution of separate actions by individual Class members would create a risk of adjudications with respect to them which would, as a practical matter, be dispositive of the interests of other Class members not parties to adjudications, or substantially impair or impede their ability to protect their interests; and

c.      Defendants have acted or refused to act on grounds generally applicable to the Class, thereby making appropriate injunctive relief with respect to the Class as a whole.

## OPERATIVE FACTS

**A.      Background Information**

25.     Founded in 1994 by Buccellato, Hidden Lake bills itself as a "therapeutic boarding school" geared toward students who exhibit oppositional-defiant behavior, low self-esteem, depression, alcoholism and drug addiction, attention deficit disorder, deteriorating family relationships and other personal

problems. The program extends at least 17 or 18 months and more typically 21 months or even longer, usually involving students 12-17 years old.

26.     Hidden Lake is actually made up of three corporations all dominated by Buccellato. Two of these corporations, HLA, Inc., and Hidden Lake Foundation, Inc., are not-for-profit corporations, with HLA, Inc. functioning more as the primary corporation that actually runs the boarding school. HLA, Inc. has throughout the Class Period had substantial assets, while Hidden Lake Foundation, Inc. is a shell corporation whose main purpose is to raise money for HLA, Inc. The third corporation, defendant Hidden Lake Academy, Inc., is a for-profit corporation which owns most of the property that the boarding school is located on and whose CEO, CFO and Secretary is Buccellato. Its main source of revenue comes in the form of lucrative "management fees" paid to it by HLA, Inc., which in 2004 exceeded over $1.3 million.

27.     Although HLA, Inc. has a nominal Board of Directors consisting of Kenneth Spooner and Spooner's father and sister, Buccellato in actuality dominates all three corporate defendants. Indeed, Buccellato negotiates all contracts with suppliers, and Spooner and the Board have virtually no say in the running of the boarding school. Moreover, Buccellato has forged Spooner's

signature on important documentation, such as contracts, tax returns and loan documents, as set forth fully below. The Board rarely meets, and when it does the meetings are *pro forma* in nature lasting sometimes only a few minutes.

28. According to its website, Hidden Lake purports to offer its students a "detailed, sequential therapeutic program which allows for a high degree of program accountability." Specifically, HLA breaks down students into "peer counseling groups", each "consisting of 14 students that are led by 2 to 3 master's-level counselors," with the counseling groups meeting three times a week for a total of seven or seven and one-half hours. HLA's treatment also entails a "wilderness component" which consists of daily outdoor activities and two-to-seven day wilderness trips that are "carefully integrated into the [therapeutic] program."

29. The final element of HLA's treatment program involves a comprehensive system of "agreements and consequences," or more precisely rules that students must abide by and rewards or punishments they face when consistently following or violating the rules. On enrollment, students must agree that they will abide by HLA's rules, with three of the most important being: that they will refrain from using or threatening to use any type of violence toward

people and property; that they will avoid using or glorifying any kinds of drugs or alcohol; and that they will avoid all physically intimate activity with another person, including holding hands, kissing or touching. Other rules include wearing appropriate clothing, keeping clean living quarters, consistently and timely doing homework and class work assignments and respecting people in positions of authority, among other things.

30.    If a student fails to abide by HLA's myriad rules, they face various punishments, some ranging from the mundane like extra work assignments or routine physical activity, to the more severe which can include the loss of all free time or in some cases being sent to HLA's more demanding off-campus wilderness program at its "sister" institute, Ridge Creek. HLA calls these punishments "restrictions", a term well-known around the campus. Even more severe punishments include "interventions," where HLA might limit food, deprive students of sleep, or force them to perform heavy physical labor. If students exhibit consistently good behavior, they are to be rewarded with "positive consequences" such as greater free time, participation in the student activity center and attending off-campus trips.

31.     Throughout each student's tenure at the school, Hidden Lake closely monitors how students communicate with their parents, other family members and friends. Specifically, students are allotted 15 minutes per week to call parents, with each phone conversation transpiring in the presence of at least one Hidden Lake employee who then records his or her observations typically in a notebook which then may be shared with other HLA personnel. Hidden Lake employees also read all incoming and outgoing mail to and from students, and all emails which as a general rule can only be sent to pre-approved family members. Hidden Lake claims that it must monitor such communications to ensure that students do not attempt to "manipulate" parents and to ensure the "confidentiality of counseling sessions." Not surprisingly, this monitoring also ensures that it is very difficult for students to say anything negative about HLA while they are enrolled there, let alone disclose timely to parents the adverse facts concerning the day-to-day reality of their actual HLA experience. Indeed, this monitoring as a practical matter extends even to students' off-campus visits with family, as HLA dissuades its students from disclosing their experiences with threats of restrictions on students' return to campus.

32.     Despite claiming to be a "therapeutic boarding school" with a comprehensive treatment program, Hidden Lake is not regulated as a mental health facility or a therapeutic residential child care program by the Georgia Department of Human Resources ("DHR"). Indeed, Hidden Lake has fought bitterly attempts by DHR to classify it as a mental health facility or a therapeutic residential child care program, to avoid being subject to appropriate state regulations. If Hidden Lake were classified as a mental health facility or a therapeutic residential child care program, it would face strict policing from DHR and receive far greater scrutiny from state regulators than it does now. For instance, DHR would closely monitor, among other things, that HLA's teachers and therapeutic staff are properly credentialed.

### B.     HLA's Standard Form Enrollment Contract

33.     Parents or other caregivers must sign a form contract to enroll their children at HLA. Throughout the Class Period, the material terms of HLA's enrollment contracts have been uniform. For instance, HLA's standard form enrollment contracts provide that "HLA agrees to: (a) provide an education commensurate with the student's abilities and capacities; (b) provide adequate room and board facilities; and (c) schedule vacations, holidays, and visits." HLA's

standard form enrollment agreements also set out the total amount of money

parents (or other caregivers) must pay to enroll their child in the program;

mandates that all such payments be made in full and that parents must also pre-pay

a non-refundable deposit for the final three months of tuition for the program;

provides that the contract "shall be enforced and interpreted under the laws of the

State of Geogia"; and, as explained more fully below, contains an unconscionably

broad and unenforceable release from *any* potential legal liability (presumably

even for grossly negligent or even other egregious misconduct) of not only Hidden

Lake, but also HLA's "officers, directors, shareholders, employees, attorneys and

agents".  According to the purported release:

> RELEASE
> Parent(s)/Guardian(s) and Student hereby voluntarily
> release and discharge HLA, its officers, directors,
> shareholders, employees, attorneys and agents from any
> and all claims, demands, actions suits or proceedings
> which such Parent(s)/Guardian(s), the Student or any
> other Parent(s), relatives or next of kin of the Student
> may have for any and all injuries, damages, and
> expenses, including, but not limited to, all personal
> injuries and illnesses and all damages to personal and real
> property caused by or arising out of, or otherwise related
> to the Student's enrollment at HLA and/or the Student's
> participation in any activity or program conducted by or
> on behalf of HLA.  Parent(s)/Guardian(s) and Student
> further hereby voluntarily release and discharge HLA and

Ridge Creek, Inc., their officers, directors, shareholders, employees, attorneys and agents from any and all claims, demands, actions, suits or proceedings which such Parent(s)/Guardian(s), the Student(s) or any other Parent(s), relative or next of kin of the student may have for any and all injuries, damages and expenses, including, but not limited to, all personal injuries and illnesses and all damages to personal and real property caused by or arising out of, or otherwise related to the Student(s) participation in any activity or program conducted or provided by Ridge Creek, Inc.

34.     HLA's standard form enrollment contract also contains an

unconscionably broad provision purporting to shift to Class member families all of

HLA's attorney fees and litigation expenses in "any" litigation between the parties,

and another requiring Class member families to indemnify HLA for "any"

liabilities. According to those provisions:

MISCELLANEOUS
(a)     Should the Student's Parent(s) and/or any third party, including grandparents, not be able to agree on the rights of one or both Parents, or one or more third parties, with regard to communications from the School, access to academic and counseling reports, and communication with, access to, and visitation with the Student, then the School shall retain attorneys to determine these relative rights, and all costs and attorney's fees incurred by the School will be billed to the Parent(s)/Guardian(s) and/or Guarantor(s) responsible for the tuition and fees under the terms of this Agreement and paid immediately upon receipt.

24

(b)     The undersigned agree that if any claims and/or litigation is brought against HLA by the undersigned or by any other party, or if any document, agents or employees of HLA are subpoenaed or otherwise required to be produced as evidence or testimony in any legal proceeding pertaining in any way to the Student or to the Student's attendance at HLA, then the undersigned shall indemnify and hold HLA harmless from any and all damages, judgments, costs and attorney's fees incurred by HLA as a result of said claims and/or litigation. All costs and attorney's fees incurred by the School will be billed to Parent(s)/Guardian(s) and/or Guarantor(s) responsible for the tuition and fees under the terms of this Agreement and paid immediately upon receipt.

(c)     The undersigned agree that if HLA chooses to retain counsel as a result of actions taken by the Parent(s)/Guardian(s), by the Student, by the legal representatives of the Parent(s)/Guardian(s) or the Student, or by any other person or entity in relation to the Student, then the undersigned will be responsible for all costs, expenses and attorney's fees incurred by HLA which shall be billed to the Parent(s)/Guardian(s) and/or Guarantor and become part of the tuition and fees under terms of this Agreement.

35.     Currently, Hidden Lake charges students a base price of over $5,900 per month for its program, and has charged over $5,000 per month since at least 2001. As the program extends typically for a term of 17-21 months, Class member families typically have paid to HLA at least $85,000 total to enroll their children there.

**C.    HLA's Specific Representations
to Parents Concerning HLA**

36.    Prior to their child's enrollment at Hidden Lake, parents are given a detailed Handbook, totaling over 60 pages, spelling out specifically Hidden Lake's rules, regulations and academic requirements.  Hidden Lake also disseminates information to parents through other avenues, like brochures, form letters, email and via its website.

37.    Hidden Lake has throughout the Class Period made a number of representations to families, including Plaintiffs and other Class members, regarding HLA's educational and therapeutic programs, among other things.  These representations were made in HLA's Handbook, website and in other documents including form letters to parents, and were intended to give HLA an air of exclusivity, and to justify Hidden Lake's expensive tuition.  For instance, Hidden Lake has represented, among other things, that it:

   a.    charges a fixed monthly tuition amount which is "all-inclusive";

   b.    offers a comprehensive academic program with classes taught by "state certified teachers" who are supervised by a "certified learning disability specialist";

c.  provides a "safe environment";

d.  does not accept for enrollment at HLA any "court-ordered," "violent" or "severely disturbed children";

e.  employs only "clinically trained" counselors who hold "a master's degree or higher";

f.  employs "a full-time nurse on staff seven days a week" who either personally distributes or "supervises trained staff" in distributing prescription medications "four times per day"; and

g.  enlists a pediatrician and a staff psychiatrist, who visit "the campus on a weekly basis," to evaluate students as necessary, including to dispense prescriptions for psychotropic medications.

## D.  The Truth Concerning Hidden Lake

38.  The truth concerning Hidden Lake throughout the Class Period has been far different from what Defendants portrayed. In fact, during the Class Period HLA misrepresented to families significant aspects of its educational offerings, operations and business practices, and omitted to disclose numerous material facts. These misrepresentations and omissions all similarly affected families' decisions to send their children to Hidden Lake, as all such families similarly relied on the

veracity of HLA's statements in enrolling their children in the program. Among others, HLA's specific misrepresentations and omissions concern the purported certification of its teachers and counselors, the nature and background of the students it admits, the medical and other supervision it offers its students, and the purported "all-inclusive" nature of the tuition payments it charges families, all as explained more fully below.

### 1. Certified Teachers

39. Despite Hidden Lake's claims that all of its teachers leading classes are state certified, a significant number and, at times during the Class Period, overwhelming majority, of the teachers on Hidden Lake's staff have not been state certified. Indeed, over the past five years the number of certified teachers on Hidden Lake's staff have fluctuated at times between zero and three each year.

40. The reason why Hidden Lake failed during the Class Period to employ consistently certified teachers is twofold. First, because Hidden Lake's program runs all year, teachers are expected to work for 12 months, with no summers off. Second, Hidden Lake reportedly pays well-below the market rate for teachers in the state of Georgia, with a pay scale ranging from $30,000 to $44,000.

41.     Because of its difficulty in attracting and employing certified teachers consistent with its representations to families, Hidden Lake instead has employed unqualified teachers with no certification and little, if any, relevant training and insufficient experience.

42.     Significantly, moreover, Hidden Lake attempts to address these deficiencies by gaming the Georgia state certification system by having uncertified teachers apply for provisional licenses. Although these applications are usually turned down ultimately by Georgia officials within six months or so, HLA during that time portrays to families that these teachers are certified in accordance with Georgia state law. Further, some of these uncertified teachers who apply for the provisional licenses have no intention of actually following-up on the certification process, but apply only so that Hidden Lake can claim, however misleadingly, that its classes are taught by "certified teachers." In other instances, uncertified teachers do not even bother going through with the charade of applying for provisional licenses.

43.     In addition to having few certified teachers, Hidden Lake has during times throughout the Class Period not even employed any certified learning

disability specialist. Thus, not only does Hidden Lake employ unqualified teachers, it employs unqualified teachers who are improperly supervised.

### 2. Improperly-Titled Counselors

44. Hidden Lake claims to offer an all-encompassing therapeutic program, the bulwark of which occurs in intimate peer group counseling sessions that are led by counselors who are "clinically trained" and hold "a master's degree or higher." However, a significant number of the counselors HLA has employed during the Class Period simply have lacked any clinical training in counseling or social work, while others hold master's degree in areas completely unrelated to social work, counseling or psychology. Moreover, the overwhelming majority of the counselors HLA has employed throughout the Class Period have not been licensed by the State of Georgia which, among other things, violates O.C.G.A. § 43-10A.

45. The fact that HLA has misrepresented to families the credentials of the teachers and counselors it employs is all the more improper in the circumstances in view of HLA's overall purported mission to provide an effective therapeutic program for troubled children and because of the significant role that peer group counseling supposedly plays in HLA's program. In short, the

credentials of HLA's teachers and counselors are indisputably central to HLA's mission.

### 3. <u>Court-Ordered and Violent Students</u>

46. Perhaps most clear and harmful of all in terms of the flat-out inconsistency with its often-touted mission as a "therapeutic" school, HLA has throughout the Class Period erroneously claimed that it does not accept "court-ordered," "violent" or "severely-disturbed" students. In fact, Hidden Lake has accepted at least five court-ordered children in the past five years, and routinely accepts violent and severely disturbed students.

47. The truth about Hidden Lake's admission practices began to be admitted in a February 24, 2006 email obtained by Plaintiffs which Clarke Poole, who was HLA's Admissions Director during the period January 2000 through March 15, 2006, sent to Nicole Fuglsang, HLA's current Admissions Director (and, subsequently, to other persons). In that email, Poole outlined three examples of students whose violent pasts should have precluded them from ever attending Hidden Lake. One of the students, a female with a violent personal history, sexually assaulted another female student, causing "internal injuries in the pelvic

area." "Then, rather than being dismissed immediately, she remained enrolled [at Hidden Lake] for another month [before leaving]."

48.     The other two students, both of whom were male, were referred to HLA by Buccellato. In fact, Buccellato has throughout the Class Period also maintained a "side" business as an educational consultant, although he has almost always referred to HLA each of the families with whom he consults. Buccellato's role as a so-called independent educational consultant and the personal economic incentives he had to refer children to HLA contributed to populating HLA during the Class Period with children who did not meet HLA's stated criteria. In fact, former HLA Admissions Director Poole labeled one of these male students as "dangerous" with the psychological profile of "Hannibal Lecter", and questioned how Hidden Lake could have ever accepted the other student in the first place. Poole continued that "there are others, of course, who were known from the beginning to be inappropriate for placement, and I'll be glad to go into them with you, but I'm sure you are starting to get the point." According to Poole's February 24, 2006 email:

From: Clarke Poole
Sent: Friday, February 24, 2006 9:50 AM
To: Nicole Fuglsang
Subject: FW: HLA Student Profile.....

Nicole,

* * *

There is a fairly long list of students whose
appropriateness I have questioned, especially in the last
year or so. To point to just a few, let's look at (Jane Doe
1), (John Doe 1), and (John Doe 2).

(Jane Doe 1) had trouble here from the beginning, with
most of her incidents involving violence. Finally, she
was complicit in an elopement that culminated in the
physical, and, by all indications, sexual assault on
another student who was hospitalized for several days
due to her physical injuries, especially internal injuries in
the pelvic area. Then, rather than being dismissed
immediately, she remained enrolled here for another
month. The educational consultant who referred her to
Hidden Lake was (Consultant 1).

(John Doe 1) came here with a very troubling history and
equally troubling psychological evaluation. He was
constantly involved in trouble including physical assaults
on other students. He finally attacked and threatened to
kill another student and the on-call clinical staff was
called to evaluate him. She determined he was not only
sincere but determined to actually try to kill the other
student, and signed the order to have him committed to a
psychiatric hospital. He did not return to Hidden Lake.

The educational consultant who referred him to Hidden Lake was its owner, Len Buccellato.

Finally, we have (John Doe 2). Why in the name of Heaven this boy was ever even considered for admission to Hidden Lake is beyond me. He should have been in a padded cell in a psychiatric prison, and we knew it going in. It's difficult to distinguish his psychological evaluation, which was done by Len Buccellato and Brad Carpenter, from that of Hannibal Lecter's. Yet, in spite of first hand knowledge that this boy was not only totally inappropriate but dangerous, he was approved for admission and attended for a full year, interspersed with hospitalizations, until withdrawn by his parents. The educational consultant who referred him to Hidden Lake was (Consultant 2).

As an aside to this disgraceful episode with (John Doe 2), I took a call several months ago from (Consultant 3) an educational consultant in Miami. She had received from us a copy of Lakeside Reflections, in which was a photo of (John Doe 2). A month before (John Doe 2)'s family contacted (Consultant 2) for help in finding placement, they had called on (Consultant 3) at her office. She had, quite sensibly, recommended only RTC's for (John Doe 2), but there was his picture in Lakeside Reflections, a Hidden Lake student. In her excited (foreign) accent, she said "Clarke! My God, Clarke! This boy is a student there? Oh my God!" At least I was able to tell her he was no longer enrolled, but I was unable to give her a reason as to why he had ever been accepted in the first place without opening an ethical can of worms, so I feigned ignorance.

There are others, of course, who were known from the beginning to be inappropriate for placement, and I'll be glad to go into them with you, but I'm sure you are starting to get the point. Len has repeatedly said to me and everyone else who has ever worked in this department that "we do not do well with dysthymic kids", yet I have never seen a dysthymic kid not accepted for admission. If we know we do poorly with them, why accept them? At least they are not a danger to others, but they do little for our retention rate, which currently stands at 40% for Peer Groups graduating in May (assuming none of the few who remain are withdrawn between now and then).

This brings us back to your question about my being or not being a part of the team. Just for clarification, you stated "You chose", indicating I have already made my decision, and the implication was that I had chosen to not be a part of the team. Perhaps you meant to say "choose", but perhaps not. I have, in fact, chosen, but not in the sense that you imply. As I said in an e-mail to you and Len several months ago, every comment and observation I have made as an HLA employee has been made with the intention of calling to management's attention practices that I believe are detrimental to the reputation and longevity of Hidden Lake Academy, as well as the safety and therapeutic well being of its students. Also as I pointed out, every time I do so I am reprimanded. I have a long list of such occurrences archived which I'll be glad to share with you and with others, should that be necessary. I am trying to be a member of this team, but I am not an automaton or a sheep. I have views and opinions which I am qualified by education and experience to express. No one has to like them or act on them, and obviously no one ever has;

but I still feel compelled to state them, even if it puts my
job in jeopardy, especially if I believe they involve
ethical compromises and issues of student safety.

I'll be glad to meet with you and with Len to discuss
these and all other issues that are of concern to you; and
when we do so, I will go into a longer list of concerns of
my own. I would appreciate a response to the issues I
have raised here in my response to your question
regarding my commitment to this school, and my
competence in evaluating applicants.

Sincerely,
Clarke Poole[.]

49.    As he acknowledges, Poole's email omits numerous other examples of

violent and mentally disturbed children who during the Class Period have attended,

and some who still currently attend, Hidden Lake. In the past year alone, one

female student reportedly attempted to commit suicide by hanging herself in her

dorm room, and suffered serious brain damage, while during a recent two month

period four other students also reportedly attempted suicide.

50.    The admission of violent and severely disturbed children during the

Class Period has led to other students being repeatedly and violently assaulted,

including at least one knife stabbing and vicious gang-like beatings. In January of

this year, one student left Hidden Lake within weeks of his entering the school

after he was violently assaulted on three separate occasions, the last of which reportedly resulted in an investigation by the Lumpkin County Sheriff's Department.

51. In an effort to ameliorate at least some aspects of the violent and anti-social behavior of many of its students, the school has made it a standard practice to strip-search students as a safety measure. However, HLA's practice of strip-searching its students is not disclosed adequately in its Handbook or other documentation given to parents. Although students and parents often complain to Hidden Lake about this practice, arguing that the school should have mentioned it in its Handbook, Hidden Lake reportedly continues to strip search at least some of its students on a routine basis.

52. Hidden Lake's reluctance to reject court-ordered, severely disturbed and violent students stems from the fact that it is highly profitable to admit such students. With monthly tuition currently totaling over $5,900, parents can spend well over $123,900 to send their children to Hidden Lake for the 21 month term. Indeed, as pointed out in Poole's email, it was Buccellato himself who referred two of Hidden Lake's most violent students in the past few years.

53. The presence of several court-ordered, severely disturbed and violent students is both contrary to HLA's representations to families and undermines HLA's mission to provide a therapeutic environment for its students, much less a "safe" and "healthy" environment as HLA represents. Parents, meanwhile, are misled both into enrolling their children at HLA initially on the belief that it is a nurturing and "therapeutic" place, and also thereafter in keeping their children enrolled as their childrens' communications with their families are monitored closely by HLA officials throughout their HLA enrollment so that they do not disclose to their parents their actual HLA experiences. Even when the children visit their families off-campus during vacations, among other things, HLA students are dissuaded from disclosing the truth under threat of being placed on restrictions when they return to campus.

54. In addition to misrepresenting itself to prospective students and their parents including with respect to the types of children it enrolls, Hidden Lake has been successful in recruiting students to the school because of Buccellato's ethically questionable relationship with educational consultants. In general, educational consultants are hired by parents to provide impartial advice as to where parents should send their troubled children to school. Realizing the significant role

consultants play in the school selection process, Buccellato showers consultants with gifts and under-the-table *de facto* bribes. Buccellato also causes HLA to pay the traveling expenses of many consultants *and* their family members who happen to visit the Atlanta metropolitan region for personal reasons. For example, HLA recently paid the travel expenses of both Leslie Goldberg, an educational consultant in Boston, Massachusetts *and* her son who is based in California, for their trip to Atlanta. Similarly, Buccellato also caused HLA to pay the travel expenses of another educational consultant based in Baton Rouge, Nancy Cadwallader, *and* her husband to visit Atlanta. In such situations, Buccellato arranges for the consultants to quickly meet him, with Hidden Lake picking up the traveling and incidental expenses of both the consultant and even the consultant's family members. Each year, Buccellato also gives expensive Christmas gifts, some totaling over $1,000, to consultants as a way of ensuring their fealty. Buccellato's close relationship with education consultants contributes both to populating HLA with students whose enrollment is directly contrary to HLA's stated admissions criteria, and has served to improperly enrich Buccellato at the expense of Plaintiffs and other Class member families.

55.     Despite HLA's efforts to mislead families and omit disclosing the truth about HLA's operations, many parents do become aware of the truth concerning some aspects of the HLA experience.  However, those parents are then faced with the Hobsian choice to *either* (a) abruptly withdraw their children from HLA -- in which case the families lose their non-refundable pre-paid three month tuition "deposit" and even *any* academic credit for the time their children were enrolled because HLA confers credits only if the student completes the program -- *or* (b) leave their children at the academy despite the conditions there of which the parents are actually aware.  Nevertheless, many parents choose at great financial and educational cost to simply withdraw their children prior to the end of the program, and thereby simply forfeit at least three months of tuition payments.  Indeed, it is no coincidence that well over 50 percent of students who have attended HLA during the Class Period have failed to graduate, with many being withdrawn by parents early.

### 4.     Improper Medical Supervision

56.     Hidden Lake's Handbook states that it employs "a full-time nurse on staff seven days a week," and that "a pediatrician visits campus at least once a week to see students (twice a week when needed)."  In fact, however, Hidden Lake

until recently did not have a full-time nurse, and throughout the Class Period has not consistently employed a full-time, properly qualified nurse. Indeed, the infirmary has in the recent past been run by a former receptionist who has no medical training. Worse yet, no physician currently visits HLA on a monthly, and certainly not a weekly, basis to see students. As a result, students have received inadequate medical treatment and medical supervision.

57. Additionally, Hidden Lake claims in its Handbook that all prescribed medication is distributed by "a nurse or another trained staff member at least four times per day," and that it enlists a staff psychiatrist, who visits "the campus on a regular basis," to evaluate students who require psychotropic medications. However, throughout the Class Period Hidden Lake has not employed sufficient personnel who are actually licensed to dispense medication to students, thus forcing the school to have untrained staff such as secretaries or pharmaceutical technicians to distribute medications to students. Indeed, Hidden Lake's recent staff psychiatrist, Consuelo Reddick, has also recently reportedly decided to no longer come to Hidden Lake's campus, and the school in the recent past has not had a properly licensed psychiatrist to evaluate students. Reportedly, Dr. Reddick will no longer travel to the HLA campus to see students because of differences she

has with HLA's administration regarding HLA's operations and services, among other things, but continues to work with some HLA students whose families are forced to pay the excessive transportation charges HLA imposes to commute those students between HLA and Dr. Reddick's office near Atlanta.

58.     Hidden Lake's staffing problems prevent the school from timely dispensing medication to its students, who are often forced to wait days to receive their medications despite the fact that such drugs must be given on a regimented basis in accordance with their instructions. In fact, despite its staffing deficiencies, Hidden Lake has throughout the Class Period refused to hire more staff who are licensed to dispense prescription medication. These practices also helped foster a dangerous campus environment where, among other things, mistakes have been frequently made in the distribution of prescription medications, and where students have had access to other students' medication.

59.     Along those lines, Hidden Lake also represents that its current Director of Addiction Services, Dr. Clay Erickson, is a properly licensed physician. In fact, however, Dr. Erickson has throughout the Class Period reportedly practiced medicine at HLA with a suspended medical license, and his license was suspended reportedly because of his own personal addiction to certain psychotropic drugs. In

particular, on April 14, 1993, the Washington State Medical Disciplinary Board

first temporarily suspended Erickson's license to practice medicine because of his

alleged alcoholism and abuse of controlled prescription drugs. The Disciplinary

Board found that Erickson "obtained controlled substances, including but not

necessarily limited to, approximately twenty (20) Vicodin tablets, approximately

twelve (12) Tylox caplets and approximately five (5) 0.5 ml morphine tubex

syringes containing 10 mg/ml of morphine, in August and/or September, 1992 for

his own use and without authorization or prescription." On March 10, 1995, the

Washington State Medical Quality Assurance Commission entered an order

suspending Erickson indefinitely "until such time as he [would] petition[] to have

the suspension lifted," and would present evidence that he has successfully

undergone substance counseling and "is capable of practicing medicine with

reasonable skill and safety." On March 11, 1998, the Washington State Medical

Quality Assurance Commission denied Erickson's petition to lift the suspension of

his medical license, ruling that Erickson had "failed to present evidence that he is

currently capable of practicing medicine with reasonable skill and safety as

required" by the March 10, 1995 Order. On its web site, Hidden Lake lists

Erickson as having an M.D. from the University of Washington School of

Medicine without also listing that his medical license has been suspended. Moreover, in addition to serving presently as HLA's "Director of Addiction Services," Erickson's duties were expanded earlier this year to include "Infirmary Supervisor" -- in effect, placing him in charge of distributing medication to students. These circumstances are particularly troubling given that a large number of Hidden Lake's students have addiction problems, and have specifically attended HLA to join a "therapeutic" environment to help combat these addictions.

### 5.     Undisclosed or Improperly Disclosed Incidental Costs

60.     Despite charging thousands of dollars per month to attend HLA and despite the fact that HLA represents this monthly payment as "all-inclusive", HLA in fact imposes on Class member families numerous additional costs. These undisclosed additional costs include, for example:  excessive transportation fees for children to visit physicians off-campus, including some $25 or more to visit a physician within Dahlonega city limits and some $94 or more for children to visit physicians outside city limits; large surcharges for shipping prohibited materials which HLA sends back to parents; "processing" fees for children to actually obtain their required prescriptions while enrolled at HLA; and big undisclosed mark-ups on toiletries which HLA forces its students to obtain from HLA's on-campus store.

In some instances, HLA simply fails to disclose in its Handbook that students will be charged for various incidental costs, such as a $350 graduation fee, while in other instances HLA fails to disclose that it posts huge profit mark-ups for incidental costs which in some cases can exceed 100 percent.

61.     During the Class Period alone these undisclosed charges and overcharges have reportedly totaled between $800,000 and $1,000,000.  And as noted, families had no practical choice but to pay these charges, as the alternative would be simply to withdraw their children and thereby forfeit money and academic credit, or have HLA withhold transcripts and diplomas for alleged non-payment.  These additional undisclosed charges and overcharges can be broken down into the following categories.

### i.     Toiletries

62.     Hidden Lake has developed an extremely lucrative side business of creating an internal store to sell to students toiletries at highly inflated prices.  Indeed, these overcharging practices were initiated in or about 2000, at the beginning of the Class Period.  Beginning in about 2000, Hidden Lake decided that parents could no longer send toiletries to their children, and instead created an

internal store where students had to purchase all toiletries. HLA purchases

toiletries in bulk from WalMart at low prices, and then sells them to students at

prices that are marked-up an average of, and sometimes well over, 100 percent.

63. Further, throughout the Class Period HLA's toiletries program

provided Buccellato with a guaranteed source of additional profits, in that Hidden

Lake does not provide students with even the most basic toiletries as part of their

so-called "all-inclusive tuition", leaving students to fend for themselves. HLA

throughout the Class Period has reportedly generated each year over $40,000 in

revenue, and over $20,000 in pure profits, from its internal store.

### ii. Shipping Costs

64. Hidden Lake represents that it carefully regulates what parents may or

may not send to their children, declaring that it will return all inappropriate items

while imposing a "small service charge." What Hidden Lake fails to disclose is

that this "small service charge" is actually a significant surcharge that in many

cases doubles HLA's actual shipping costs. Hidden Lake generates over $10,000 a

year from these shipping costs, several thousand dollars of which is because of

HLA's undisclosed mark-ups. Most parents are unaware of these overcharges, as

Hidden Lake simply bills parents for shipping costs, among other things, without breaking down the service fee it charges.

### iii.   Transportation Costs for Medical Visits

65.   HLA charges parents excessive transportation fees for transporting students to and from physicians for medical visits. In its Handbook, HLA erroneously claims that "there is a small fee for transporting students to appointments outside the Dahlonega area," even though in actuality it charges students a $25 transportation fee to visit a physician within Dahlonega, and some $94 or more in transportation fees to visit a physician outside of Dahlonega.

66.   As with HLA's undisclosed other mark-ups, these transportation costs quickly add up, especially for students with recurring medical problems, and those whose medical conditions require that they go to Atlanta for certain treatments unavailable from local medical facilities. Indeed, for many families these costs can end up adding hundreds or even thousands of dollars to their tuition bills, particularly in the case of students in need of frequent medical visits. In total, Hidden Lake has billed parents during the Class Period thousands of dollars for these transportation costs which were never properly disclosed.

### iv.  Overcharging for Dental Services

67.  HLA maintains a dental clinic on its campus.  However, HLA has not received proper licenses to own and operate that clinic.  In addition, HLA has overcharged families throughout the Class Period for services its dental clinic offered.  In other instances, HLA has billed Class member families for dental services never rendered.  For instance, HLA's dental clinic has billed families for certain special cephalometric x-ray procedures to determine orthodontics treatment, despite reportedly not even having any such special x-ray machine on campus.

### v.  Graduation Fees

68.  Hidden Lake also fails to disclose that students will be assessed a fee, typically a minimum of $150 or more, with some families paying as much as $350, which is to be used to purchase a suitable outfit for graduation.  Prior to graduation, counselors take students to purchase outfits that must be worn at graduation, with students being able to spend up to the $150-$350 amount they pre-pay, for the outfit.  However, students often purchase outfits that are less than $150-$350, although parents are still charged the full $150-$350 fee.  When students inform Hidden Lake that they did not use the full $150-$350 and therefore

that they are entitled to be reimbursed for the balance of the unused funds, HLA officials simply ignore these requests, refusing to refund students any money.

### vi.    Miscellaneous Other Incidental Costs

69.    Hidden Lake also overcharges parents for numerous incidental costs that otherwise should fall within the allegedly "all-inclusive" $5,900-plus month tuition. For instance, HLA levies an administrative fee each time it processes a student's pharmaceutical prescription of typically $10 or more (its Handbook misleadingly states only that HLA assesses administrative fees for pharmaceutical processing). As another example, although HLA's Handbook also notes generally that it will impose an "incidental administrative fee" for college applications, college courses and SAT/ACT tests, it omits that HLA does not charge parents for these items at cost, but instead also adds undisclosed mark-ups. Incredibly, HLA even overcharges students for vaccinations and shots, imposing a more than 50 percent mark-up for flu-shots and $90 for a meningitis shot that costs significantly less. During the Class Period, these additional miscellaneous overcharges have resulted in thousands of dollars of added profit for Hidden Lake.

### E.    <u>Buccellato's Personal Control of Hidden Lake</u>

70.    HLA's zeal to cut corners and misrepresent itself, whether by refusing to hire certified teachers, admitting inappropriate students or inappropriately billing parents for "incidental" costs, stems from the fact that it is run in significant part for the personal enrichment of its founder, defendant Buccellato. Indeed through a variety of means, Buccellato has been able to extract millions of dollars from Hidden Lake for his personal benefit, while placing completely unqualified people -- including even his longtime companion, Kenneth Spooner -- in positions of purported authority.

71.    Defendant Buccellato acted in concert with, dominated and otherwise controlled the operations of the three HLA corporate defendants, and planned, orchestrated and executed the wrongdoing as alleged on behalf of himself individually and through the HLA entities, which Buccellato controlled and operated for his own personal benefit and as his own alter egos. Among other things, defendant Buccellato dominated and controlled HLA's operations and finances, including the statements made to families regarding HLA's costs and services. In addition, defendant Buccellato exercised that domination and control to facilitate and enable the misconduct that resulted in the damages suffered by

Plaintiffs and the Class member families. Accordingly, the acts and omissions of each of the HLA entities should be attributed to one another and to defendant Buccellato personally.

72.     As a result of Buccellato's control and domination over HLA, Buccellato was able to personally benefit financially from misconduct alleged in several respects. The improper financial benefits Buccellato directly or indirectly received can be broken down into the following categories.

### 1.     Excessive Management Fees

73.     Buccellato runs at least two for-profit corporations -- Hidden Lake Academy, Inc., and Ridge Creek -- that have received hundreds of thousands of dollars in fees from the non-profit HLA, Inc. during the Class Period. In 2004 alone, HLA, Inc. paid Hidden Lake Academy, Inc. approximately $1,310,471 for management services and Ridge Creek $574,655 for use of its wilderness facilities. Hidden Lake Academy, Inc. also owns all of the land on which HLA, Inc. is located.

74.     Buccellato's control over, and the connection between, HLA, Inc., Hidden Lake Academy, Inc. and Ridge Creek is best demonstrated by the fact that

all three share at least one common bank account (at Lumpkin County Bank), and their records can be accessed by Buccellato all at once.

75. The management fees Hidden Lake Academy, Inc. obtained from HLA, Inc. at Buccellato's direction were excessive. Further, at least a material portion of those fees were obtained directly or indirectly from Class member families as a result of the wrongdoing alleged in this Second Amended Complaint.

## 2. Loan Repayments and Taxes

76. Since its founding in 1994, Hidden Lake has paid Buccellato's personal taxes on at least three occasions, including his 1995 federal taxes which reportedly totaled some $124,000 and/or his 1996 federal taxes which reportedly totaled some $123,000. Likewise, Hidden Lake has routinely paid substantial amounts of Buccellato's personal loans, resulting in expenditures from the boarding school totaling in the hundreds of thousands of dollars.

77. A material portion of the payments HLA made at Buccellato's direction and for Buccellato's personal loans and taxes were improperly obtained directly or indirectly from Plaintiffs and Class member families.

### 3.    **Personal Expenses**

78.    Buccellato bills a significant part, indeed at times an overwhelming majority, of his personal expenses to HLA. These include expenses for lavish vacations, extravagant meals, gifts and other personal items, like home furnishings and cars and other vehicles. In fact, during the Class Period Buccellato has billed to HLA at least three luxurious personal vacation packages he, Kenneth Spooner, and certain of Buccellato's nieces and nephews (specifically, Emily Buccellato, Katie Buccellato and Andrew Buccellato) reportedly took as a graduation present from Buccellato personally. In another instance during the Class Period, Buccellato used school funds to buy a fully equipped laptop computer for his nephew. Buccellato even bills Hidden Lake for contributions to other not-for-profit organizations.

79.    In total, Buccellato has during each year of the Class Period billed more than $100,000 of his personal expenses directly to the school.

80.    Buccellato's improper billing of HLA extends beyond credit card expenses. For instance, Buccellato has used on multiple occasions during the Class

Period HLA's food service provider to cater private affairs, often running up tabs that are in the five figures, with Buccellato directing HLA to simply pay the tab.

81.     Buccellato's control of Hidden Lake's financial and other resources is well known among certain members of the Hidden Lake community.

### 4.     Misuse of Hidden Lake Staff

82.     Buccellato also uses improperly school staff for his personal use. Buccellato's misuse of Hidden Lake staff runs the gamut from maintenance workers to licensed psychologists.

83.     Specifically, Buccellato has used HLA maintenance staff on at least three separate occasions to repair personal properties that he intended to either rent or sell, including in the late 1990s when he had maintenance staff paint and repair both a house he owned for rental purposes, and the house of his then-recently deceased aunt.  More recently, in December 2005, Buccellato used HLA maintenance staff to repair another property set on 28 acres which he and Spooner own jointly, and which they intended to rent.  In fact, in December 2005, Buccellato reportedly sent a memo to the entire maintenance staff (including Arlen Garett, then maintenance supervisor and maintenance employees Jason Loggins

and Nathan Garett, as well as the housekeeping supervisor Tina Roper and housekeeping employees Adrian White and Jessica Sanford), directing them to service that property, which is located in Lumpkin County. Buccellato has also recently used both HLA's maintenance and housekeeping staff to help maintain another property Buccellato owns in Atlanta. In all of these instances, Buccellato did not pay HLA maintenance staff from his personal funds for completing these projects, but instead employed them during school hours, and paid them with school funds.

84.     Buccellato also uses psychologists who are supposedly employed by Hidden Lake to work at his private practice in Atlanta, Georgia. Currently, or in the very recent past, Buccellato has or had arrangements specifically with both Dr. Steven Taylor and Dr. Brad Carpenter -- two psychologists presently or formerly on Hidden Lake's staff -- to work several days per week in Buccellato's private practice seeing patients. In fact, at times during the Class Period Dr. Taylor reportedly spent up to four days a week servicing clients exclusively in Buccellato's private practice. Buccellato's misuse of Dr. Taylor and Dr. Carpenter resulted not only in additional improper revenues to Buccellato at the expense of

Class member families, but also contributed significantly to the chronic deficiencies in HLA staffing for psychologists.

### 5. Misuse of Hidden Lake Students

85. In addition to misusing HLA personnel and professional resources, Buccellato and HLA have also misused students, particularly those on restrictions, by having them do manual labor on HLA properties. For instance, Buccellato has reportedly used recently several students to help clear land on a property near HLA which Buccellato planned to develop. Similarly, Defendants also recently solicited funds to build a stable for HLA; reportedly, whether from diversion of the funds or a shortage of proceeds raised, the fund did not raise enough money and Defendants instead have used restricted students to help build the stables. Buccellato has also used students, including the Plaintiffs, to clear land, dig ditches, dig trenches for a swimming pool, and otherwise do the work of HLA staff members whose employment he has eliminated.

86. Buccellato's use of students to do HLA manual labor was similarly not disclosed to families at the time they entered into their enrollment contracts. Further, Defendants' misuse of such students to do manual labor violates countless

federal and state labor regulations. Moreover, these practices have resulted from simple economics: by using students to do this work, Defendants employ less staff and thereby make more money.

### 6. Student Chapel Fund

87. In its Handbook, HLA urges Class member families to make donations to a Student Chapel Fund, stressing that Hidden Lake is "committed in [its] belief in the importance of faith, worship and reverence in the personal growth of our students. The building of a campus chapel that will represent all students [sic] faiths in an integral core of our future growth, and important to the continued spiritual growth of our students."

88. Many Class member families have made such additional contributions.

89. In fact, however, Buccellato has taken funds directly from the Student Chapel Fund program for his own personal use. Indeed, thousands of dollars from that Fund are now reportedly missing. In fact, some members of the Hidden Lake community doubt if there is currently any money in the Student Chapel Fund or even if HLA ever intended to devote those funds to establish a student chapel.

### 7.  **Kenneth Spooner**

90.  Buccellato has used his multiple positions of authority, control and domination of the HLA entities to appoint his long-time companion, Kenneth Spooner, to the posts of CEO, CFO, Secretary and Board Chairman of HLA, Inc., the not-for-profit corporation that actually operates the boarding school.  Not surprisingly, Spooner has not independently exercised authority but instead has deferred to Buccellato regarding the operations of the boarding school.  Spooner knew or ignored that Buccellato has throughout the Class Period improperly operated HLA by, among other things, using HLA's financial and human resources for Buccellato's own personal use, yet has permitted Buccellato to engage in this conduct.  Indeed, Spooner has actually directly or indirectly participated in and received the benefits from Buccellato's violations, accompanying Buccellato on several lavish vacations and extravagant meals at HLA's -- and ultimately the Class member families' -- expense, including the three infamous vacations Buccellato took certain of his nieces and nephews on as graduation gifts described above.

91.  Spooner's fealty to Buccellato is best demonstrated by the fact that Buccellato has repeatedly forged Spooner's signature on important documents

related to HLA, Inc., with Spooner's full knowledge. For instance, Buccellato has reportedly forged Spooner's signature on several Internal Revenue Service ("IRS") forms HLA filed during the Class Period, including IRS Form 990's HLA filed as recently as for tax years 2005 and 2004, as well as various loan and loan extension documents for loans HLA has obtained from local banks, including First Cherokee State Bank (one of HLA's primary lenders), a loan extension granted by Lumpkin County Bank, and another loan to HLA by Nexity Bank. Along these lines, HLA's long-time outside law firm, Quirk & Quirk, reportedly is or should be aware of Spooner's duties to execute properly HLA documents, and reportedly even represented one of those bank lenders at the same time it was representing HLA. In fact, for purposes of allegedly complying with IRS regulations the checks Spooner purportedly "signs" on behalf of HLA are not in reality actually signed by Spooner at all, but instead are executed by Buccellato via a "stamp" representing Spooner's signature. Moreover, Buccellato negotiates all contracts with suppliers, and makes virtually all decisions related to the boarding school, no matter how mundane, leaving Spooner with no real power.

92. Buccellato has also placed Spooner as Chairman of HLA, Inc.'s nominal Board of Directors, whose other two members are Spooner's sister and

father. The Board rarely meets, and when it does the meetings are *pro forma* lasting only a few minutes. Board members do not question, let alone challenge Buccellato, who is free to operate the boarding school however he wants. In doing so, Spooner appears to have abdicated improperly his duties as a director under Georgia law, and contributed to the violations alleged.[1]

93.     Spooner's allegiance to Buccellato and the Board's overall ineffectiveness has contributed to enabling Buccellato to run Hidden Lake as his personal fiefdom, commit the financial and other violations alleged, convert school resources for personal expense, place unqualified people in positions of authority, hire unqualified teachers and peer counselors and betray the trust placed unto him and Hidden Lake by parents, students and education authorities alike.

**F.     The Exculpation, Attorney Fee Shifting and Indemnification Clauses in Hidden Lake's Contract Are Unconscionable and Unenforceable**

94.     As stated above, Hidden Lake's standard form enrollment agreement contains an unconscionably broad and unenforceable release which, in pertinent

---

[1]     Plaintiffs have not named Spooner as a defendant in this Second Amended Complaint. Plaintiffs reserve the right to add Spooner and other persons as defendants in this action in an amended complaint, subject to the results of their continuing investigations.

part, purports to release not only Hidden Lake, but also "its officers, directors, shareholders, employees, attorneys and agents from *any and all* claims ...." (emphasis added). In addition and also as set forth above, Hidden Lake's standard form enrollment agreement also contains provisions requiring Class member families to indemnify HLA "from *any and all* damages, judgments, costs and attorney's fees", and to pay "*all* costs, expenses and attorney's fees incurred by HLA which shall be billed to the Parent(s)/Guardian(s) and/or Guarantor and become part of the tuition and fees under the terms of this Agreement." (emphasis added)

95.     The exculpation, indemnification and attorney fee shifting provisions in HLA's standard form contract are unconscionable and invalid and should be declared unenforceable in the circumstances here. In particular, those clauses are invalid because parents were wrongfully induced into agreeing to them as a direct and proximate result of the misrepresentations and omissions of material fact which Defendants issued initially to induce Class member families to enroll their children at HLA, and as a result of Defendants' continuing improper acts thereafter; because those clauses are so one-sided in HLA's favor as to be both procedurally and substantively unconscionable; because those clauses do not apply

whatsoever following the time that students are no longer enrolled at HLA; because as fiduciaries the Defendants are precluded from providing for the students to release, in advance, "any and all claims" the student may have against the Defendants; and because in view of the facts and misconduct as alleged, it would be inequitable to enforce these clauses as those clauses should be declared void *ab initio* in the circumstances of this case.

## FIRST CAUSE OF ACTION

### (Against Defendant HLA, Inc. for Breach of Contract)

96.     Plaintiffs incorporate by reference each paragraph set forth above.

97.     Plaintiffs assert this claim individually and on behalf of the Class against defendant HLA, Inc.

98.     Defendant HLA, Inc. (d/b/a Hidden Lake Academy) is the formal party to the contracts entered into by Plaintiffs and the members of the Class pursuant to which Plaintiffs and the Class enrolled their children at HLA.

99.     HLA, Inc. entered into, and duly executed, contracts with the legal guardians of each student who attended the school.  In accordance with the terms

of those agreements, Plaintiffs and the members of the Class paid tuition to Hidden Lake.

100. The material terms of the contracts entered into by Plaintiffs and the members of the Class were uniform.

101. Among other things, the contracts required that Hidden Lake "[p]rovide an education commensurate with the Student's abilities and capacities" and "adequate room and board facilities". Accordingly, Hidden Lake was required to provide an adequate education and room and board consistent with its contractual obligations. As part of those obligations, Hidden Lake was required to employ qualified teachers, counselors, nurses, certified learning disability specialists, and a properly licensed director of addiction services, and was also required to not use untrained staff to distribute to students prescription medication or to accept students for enrollment who were either "court ordered," "violent" or "severely disturbed", among other things. The contract also set out the fee Class member caregivers would pay to enroll their children at Hidden Lake which was represented in HLA's marketing materials to be "all-inclusive", among other things.

102. Hidden Lake breached its contractual obligations by providing students with deficient educational and therapeutic services and inadequate medical and other monitoring and room and board. Specifically, Hidden Lake, among other things, employed uncertified teachers, peer counselors with no masters' degrees or with degrees in areas unrelated to psychology, education or social work who had received little if any clinical training, untrained staff who were responsible for distributing to students prescription medications, and an individual as Director of Addiction Services (Clay Erickson) whose license had been suspended because of his own addiction to various psychotropic drugs. In addition, Hidden Lake also did not readily employ full-time nurses who could properly dispense medication, or properly certified learning disability specialists; accepted and enrolled several students during the Class Period who were either "court ordered," "violent" or "severely disturbed"; and imposed excessive charges and overcharges for numerous incidental items, all as alleged more fully above.

103. As a direct and proximate result of HLA, Inc.'s contractual breaches, Plaintiffs and the members of the Class were injured.

104. The contractual breaches by HLA, Inc. were a substantial, direct and proximate cause of the damages suffered by Plaintiffs and the members of the Class.

105. By reason of the foregoing, HLA, Inc. is liable to Plaintiffs and the members of the Class for the substantial damages it caused in an amount to be established at trial.

## SECOND CAUSE OF ACTION

### (Against Defendants HLA, Inc. for Breach of the Implied Covenant of Good Faith and Fair Dealing)

106. Plaintiffs incorporate by reference each paragraph set forth above.

107. Plaintiffs assert this claim individually and on behalf on behalf of the Class against defendant HLA, Inc.

108. Defendant HLA, Inc. (d/b/a Hidden Lake Academy), as the party to the standard form enrollment contracts entered into by Plaintiffs and the members of the Class, was obligated to act in good faith, to deal fairly, and to adhere to the terms and spirit of its contract with Plaintiffs and the members of the Class, as the law has long recognized that an implied covenant of good faith and fair dealing exists between parties to a contract. These obligations included, among other

things, that HLA, Inc. act in accordance with the representations Hidden Lake

made to Plaintiffs and other Class member families concerning the educational

offerings and therapeutic services of HLA and that, as the parties' contract states,

that HLA "[p]rovide an education commensurate with the Student's abilities and

capacities" and "adequate room and board facilities". Accordingly, Hidden Lake

was obligated, among other things, to employ certified teachers and peer

counselors with master's degrees in areas related to psychology, education, social

work and counseling; to employ a full-time, properly certified nurse and a properly

licensed learning disability specialist; to use properly trained and supervised staff

to dispense to students prescription medication; to not admit students who were

either "court ordered," "violent" or "severely disturbed"; and to not improperly

charge and overcharge Class member families for numerous incidental items.

109. Defendant HLA, Inc. breached its implied covenant of good faith and

fair dealing that accompanied its performance and obligations under those

contracts by misrepresenting and failing to disclose material facts concerning the

operations of Hidden Lake Academy, by not employing the requisite personnel it

stated it would employ, and by improperly charging and overcharging Class

member families for numerous incidental items, all as alleged more fully above.

110. The breaches of the implied covenant of good faith and fair dealing by defendant HLA, Inc. were a substantial, direct and proximate cause of the damages suffered by Plaintiffs and the members of the Class.

111. By reason of the foregoing, defendant HLA, Inc. is liable to Plaintiffs and the members of the Class for the substantial damages it caused in an amount to be established at trial.

## THIRD CAUSE OF ACTION

### (Against All Defendants for Violating Georgia's Fair Business Practices Act)

112. Plaintiffs incorporate by reference each paragraph set forth above.

113. Plaintiffs assert this claim individually and on behalf of the Class against all Defendants.

114. Plaintiffs bring this claim pursuant to Georgia's Fair Business Practices Act, O.C.G.A. § 10-1-390 *et seq.* (the "FBPA"). In violation of the FBPA, Defendants employed deceptive acts and practices by making numerous false claims and by omitting to timely and accurately disclose numerous material facts concerning Hidden Lake Academy, thereby causing Plaintiffs and the members of the Class ascertainable losses, all as alleged more fully above.

115. Plaintiffs and the members of the Class are consumers within the meaning of the FBPA. Among other things, Defendants' practices were addressed to the market generally and/or otherwise implicate consumer protection concerns and thus fall within the FBPA.

116. Unfair methods of competition and unfair or deceptive acts or practices are defined and declared unlawful in the FBPA, O.C.G.A. § 10-1-393. The unfair or deceptive acts or practices as defined in O.C.G.A. § 10-1-393(a) include, without limitation, "unfair or deceptive acts or practices in the conduct of consumer transactions and consumer acts or practices in trade or commerce ...."

117. Defendants violated the FBPA, including without limitation O.C.G.A. §§ 10-1-393(a) and (b)(9), by making false, deceptive and misleading misrepresentations and by omitting to disclose material facts concerning the education, therapeutic services, operations and costs of HLA. Specifically, Defendants misrepresented or failed to disclose, among other things: that Hidden Lake's classes are led by uncertified teachers; that many peer counseling groups are led by counselors with master's degrees in areas unrelated to psychology, education or social work and who have little clinical training; that Hidden Lake accepts students who are either "court ordered," "violent" or "severely disturbed";

68

that Hidden Lake does not employ a full-time, properly certified nurse; that Hidden Lake uses untrained, unlicensed staff to distribute prescription medication to students; that Hidden Lake does not employ a properly licensed learning disability specialist; and that Hidden Lake charges and overcharges students for numerous incidental charges, all as alleged more fully above.

118. Unfair or deceptive acts or practices as defined in O.C.G.A. § 10-1-393(b)(9) include, among other things, "advertising goods or services with intent not to sell them as advertised."

119. Defendants' unlawful, unfair and/or deceptive practices as alleged are continuing and widespread in nature. Plaintiffs and the members of the Class have been damaged as a proximate result of Defendants' improper course of conduct and violations of the FBPA, in an amount to be determined at trial.

## FOURTH CAUSE OF ACTION

**(Against Defendants for Unjust Enrichment
on Behalf of Plaintiffs and Class Members)**

120. Plaintiffs incorporate by reference each paragraph set forth above.

121. Plaintiffs assert this claim individually and on behalf of the Class against all Defendants.

122. As a result of Defendants' improper acts and practices alleged herein, Plaintiffs and the members of the Class were misled and harmed regarding HLA's education, therapeutic services, operations and costs and also were charged for, and paid, numerous improper incidental costs.

123. Defendants knew that Plaintiffs and the members of the Class would rely on Defendants' acts and representations, and Plaintiffs and the members of the Class did so rely.

124. By virtue of Defendants' misrepresentations and improper acts as alleged more fully above, Plaintiffs and the members of the Class were injured.

125. Defendants have benefitted from, and have been unjustly enriched at the expense and to the detriment of, Plaintiffs and the members of the Class, and have been unjustly enriched thereby.

126. It would be inequitable for Defendants to be permitted to retain the benefits by which they have been unjustly enriched. Accordingly, the improper benefits Defendants have obtained should, in the alternative and to the extent relief is for any reason denied to Plaintiffs and the Class in connection with the other claims Plaintiffs have asserted, be returned to Plaintiffs and the Class.

## BASIS OF ALLEGATIONS

Plaintiffs make the foregoing allegations on information and belief based on their own investigation and the investigation of Plaintiffs' counsel which included, among other things, a review of documents relating to Hidden Lake including state and other regulatory filings by the Defendants, on-line databases and other computer research and other documents and information, and interviews with persons with relevant knowledge of the facts. Plaintiffs believe that additional evidentiary support will exist for their allegations after they are afforded a reasonable opportunity for discovery.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs on behalf of themselves and the Class, pray for the following relief:

a.     declaring this action to be a class action properly maintained on behalf of the Class under Rules 23(a) and (b) of the Federal Rules of Civil Procedure and certifying Plaintiffs as the Class representatives thereof;

b.     finding that Defendants have violated the law as alleged;

c.     awarding Plaintiffs and the members of the Class damages, including but not limited to compensatory, treble and punitive damages, together with interest thereon, to the maximum extent permitted by law;

d.     awarding Plaintiffs and the members of the Class their costs and expenses of this litigation, including but not limited to reasonable attorneys' fees, experts' fees and other costs and disbursements;

e.     declaring unenforceable the provisions in Hidden Lake's standard form enrollment contract with Plaintiffs and the members of the Class which purports to i) absolve Hidden Lake and other persons of "any and all" legal liability, ii) shift to Plaintiffs and the Class the obligation to pay HLA's attorney fees and expenses, and iii) require Plaintiffs and the members of the Class to indemnify Hidden Lake for "any and all" liabilities;

f.     declaring that defendant Buccellato so controls and dominates the various defendant Hidden Lake entities that the corporate veils of such entities are pierced such that Buccellato may be held personally liable;

g.     ordering an accounting of all funds Hidden Lake directly or indirectly paid to or for the benefit of defendant Buccellato during the Class Period;

h.  imposing a constructive trust upon all monies and assets Defendants have acquired from Plaintiffs and the members of the Class as a result of Defendants' violations;

i.  enjoining Defendants from committing any future violations and requiring Defendants to conform their educational offerings and services to the actual representations HLA has made regarding those offerings and services; and

j.  awarding Plaintiffs and the members of the Class such other and further relief as this Court may deem just and proper.

## DEMAND FOR TRIAL BY JURY

Plaintiffs demand a trial by jury of all issues so triable.

Dated: April 17, 2007

Respectfully submitted,

**BERGER & MONTAGUE, P.C.**

**GORBY, REEVES & PETERS, P.C.**

/s/ Lawrence J. Lederer, Esq.
Merrill G. Davidoff, Esq.
mdavidoff@bm.net
Lawrence J. Lederer, Esq.
llederer@bm.net
Lane L. Vines, Esq.
lvines@bm.net
Jonathan H. Stanwood, Esq.
jstanwood@bm.net
(Admitted *Pro Hac Vice*)
David Anziska, Esq.
danziska@bm.net
1622 Locust Street
Philadelphia, Pennsylvania 19103
Tel: (215) 875-3000
Fax: (215) 875-4604

/s/ Mary Donne Peters, Esq.
Michael J. Gorby, Esq.
mgorby@gorbyreeves.com
(Georgia Bar No. 301950)
Mary Donne Peters, Esq.
mpeters@gorbyreeves.com
(Georgia Bar No. 573595)
Two Ravinia Drive, Suite 1500
Atlanta, Georgia 30346-2104
Tel: (404) 239-1150
Fax: (404) 239-1179

*Attorneys for Plaintiffs*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
## GAINESVILLE DIVISION

```
--------------------------------------------------  )
JILL RYAN, et al.,                                   )
individually and on behalf of                        )
others similarly situated,                           )
                                                     )
                    Plaintiffs,                      )     CIVIL ACTION FILE NO.:
                                                     )     2:06-CV-0146-WCO
          -v-                                        )
                                                     )     CLASS ACTION
HIDDEN LAKE ACADEMY, INC.,                           )
et al.,                                              )
                                                     )
                    Defendants.                      )
--------------------------------------------------  )
```

## NOTICE OF FILING OF PLAINTIFFS' SECOND AMENDED CLASS ACTION COMPLAINT

Plaintiffs hereby file their Second Amended Class Action Complaint.

Plaintiffs are timely filing their Second Amended Complaint in accordance with the

Order of the court dated April 12, 2007.

In addition, plaintiffs respectfully note that with the filing of their Second

Amended Complaint, the pleadings in this case are not closed. Compare April 12,

2007 Order at p.2 ("Unlike many class certification proceedings, the pleadings in

this case are closed ...."). To the contrary, the Second Amended Complaint adds

three additional families as plaintiffs in this litigation, specifically: Walter Coles,

Theresa Pines, and Dr. Edward Roberson and his wife, Madeleine Roberson, Esq.

These additional plaintiffs comprise the group of five families which have moved the court for class certification in this litigation.[1]

Accordingly, the Second Amended Complaint necessarily asserts new factual allegations concerning these three additional families, including the amounts they paid HLA, their residences for purposes of diversity of citizenship, and the dates their children attended HLA. See Second Amended Complaint at paragraphs 14(c-e). And, as plaintiffs noted in their motion and incorporated memorandum for leave to file their Second Amended Complaint (Document no. 63-1, at pp's 6-7), the burden on defendants to file amended or new answers to ensure that the pleadings

---

[1]    Notably, although only the five plaintiff families seek to be the representatives of the class, sixteen other class member families have separately filed sworn declarations supporting certification of the class in this case. See Document Nos. 58-59 (attaching all such declarations).

Further, numerous additional families alleging claims have also contacted plaintiffs' counsel in support of class certification. In this regard, where, as here, a defendant claims it has only limited funds, class certification under Rule 23(b)(1)(B) becomes even more essential. Ortiz v. Fibreboard Corp., 527 U.S. 815, 841, 119 S.Ct. 2295, 2312 (1999) ("In sum, mandatory class treatment through representative actions on a limited fund theory was justified with reference to a 'fund' with a definitely ascertained limit, all of which would be distributed to satisfy all those with liquidated claims based on a common theory of liability, by an equitable, pro rata distribution."). Defendants similarly concede that Fed.R.Civ.P. 23(b)(1)(B) "is the 'limited fund' subdivision of Rule 23". Quoting Defendants' Brief in Opposition to Plaintiffs' Motion for Class Certification (Doc. No. 45) at p. 25 (citing Ortiz). Class certification under Rule 23(b)(1)(B) is proper even in the absence of common issues predominating in a class action case.

2

are closed is minimal. Nevertheless, plaintiffs have no objection to the extent the defendants seek a reasonable extension to file any such new or amended answers.

Respectfully submitted this 17th day of April, 2007.

**BERGER & MONTAGUE, P.C.**                **GORBY, REEVES & PETERS, P.C.**

/s/ Lawrence J. Lederer, Esq.               /s/ Mary Donne Peters, Esq.
Merrill G. Davidoff, Esq.                   Michael J. Gorby, Esq.
mdavidoff@bm.net                            mgorby@gorbyreeves.com
Lawrence J. Lederer, Esq.                   (Georgia Bar No. 301950)
llederer@bm.net                             Mary Donne Peters, Esq.
Lane L. Vines, Esq.                         mpeters@gorbyreeves.com
lvines@bm.net                               (Georgia Bar No. 573595)
Jonathan Stanwood, Esq.
jstanwood@bm.net
(Admitted Pro Hac Vice)
David Anzinska, Esq.
danzinska@bm.net

1622 Locust Street                          Two Ravinia Drive, Suite 1500
Philadelphia, Pennsylvania 19103            Atlanta, Georgia 30346-2104
(215) 875-3000                              (404) 239-1150
(215) 875-4604 Fax                          (404) 239-1179 Fax

*Counsel for Plaintiffs and Class*

3

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
## GAINESVILLE DIVISION

---------------------------------------------------- )
)
**JILL RYAN**, *et al.*, )
**individually and on behalf of** )
**others similarly situated,** )
)
      **Plaintiffs,** )    **CIVIL ACTION FILE NO.:**
)    **2:06-CV-0146-WCO**
    **-v-** )
)    **CLASS ACTION**
**HIDDEN LAKE ACADEMY, INC.,** )
*et al.*, )
)
      **Defendants.** )
---------------------------------------------------- )

## CERTIFICATION

Counsel for Plaintiffs hereby certifies that the text of this document has been prepared with Times New Roman 14 point, one of the fonts and point selections approved by the Court, and complies in all respects with Local Rule 5.1(C) of the United States District Court, Northern District of Georgia.

Respectfully submitted this 17th day of April, 2007.

**BERGER & MONTAGUE, P.C.**

/s/ Lawrence J. Lederer, Esq.
Merrill G. Davidoff, Esq.
mdavidoff@bm.net
Lawrence J. Lederer, Esq.
llederer@bm.net
Lane L. Vines, Esq.
lvines@bm.net
Jonathan Stanwood, Esq.
jstanwood@bm.net
(Admitted Pro Hac Vice)
David Anzinska, Esq.
danzinska@bm.net

1622 Locust Street
Philadelphia, Pennsylvania 19103
(215) 875-3000
(215) 875-4604 Fax

**GORBY, REEVES & PETERS, P.C.**

/s/ Mary Donne Peters, Esq.
Michael J. Gorby, Esq.
mgorby@gorbyreeves.com
(Georgia Bar No. 301950)
Mary Donne Peters, Esq.
mpeters@gorbyreeves.com
(Georgia Bar No. 573595)

Two Ravinia Drive, Suite 1500
Atlanta, Georgia 30346-2104
(404) 239-1150
(404) 239-1179 Fax

*Counsel for Plaintiffs*

```
--------------------------------------------------  )
JILL RYAN, et al.,                                  )
individually and on behalf of                       )
others similarly situated,                          )
                                                    )
            Plaintiffs,                             )      CIVIL ACTION FILE NO.:
                                                    )      2:06-CV-0146-WCO
        -v-                                         )
                                                    )      CLASS ACTION
HIDDEN LAKE ACADEMY, INC.,                          )
et al.,                                             )
                                                    )
            Defendants.                             )
--------------------------------------------------  )
```

## CERTIFICATE OF SERVICE

This is to certify that I have this day served counsel for all parties in the foregoing matter with a copy of and plaintiffs' **SECOND AMENDED CLASS ACTION COMPLAINT** and **NOTICE OF FILING OF PLAINTIFFS' SECOND AMENDED CLASS ACTION COMPLAINT** with the Clerk of Court using CM/ECF system which will automatically send email notification of such filing to the following counsel of record:

Letitia A. McDonald, Esq.
tmcdonald@kslaw.com
Barry Goheen, Esq.
bgoheen@kslaw.com
Robert C. Khayat, Jr., Esq.
rkhayat@kslaw.com
**KING & SPALDING, LLP**
1180 Peachtree Street, N.E.
Atlanta, GA 30309-3521

*Attorneys for Defendants Hidden
Lake Academy, Inc., HLA, Inc.
Hidden Lake Foundation, Inc.
And Dr. Leonard Buccellato*

Robert A. Barnaby, II, Esq.
rbarnaby@carteransley.com
Lisa R. Richardson, Esq.
lrichardson@carteransley.com
**CARTER & ANSLEY, LLP**
1180 West Peachtree Street
2300 Atlantic Center Plaza
Atlanta, GA 30309

*Attorneys for Defendants Hidden
Lake Academy, Inc., HLA, Inc. and
Dr. Leonard Buccellato*

Respectfully submitted this 17th day of April, 2007.

**GORBY, REEVES & PETERS, P.C.**

/s/ Mary Donne Peters, Esq.
Michael J. Gorby, Esq.
mgorby@gorbyreeves.com
(Georgia Bar No. 301950)
Mary Donne Peters, Esq.
mpeters@gorbyreeves.com
(Georgia Bar No. 573595)

Two Ravinia Drive, Suite 1500
Atlanta, Georgia 30346-2104
(404) 239-1150
(404) 239-1179 Fax

2